## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| CALEB HO, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>        v.<br><br>FLOTEK INDUSTRIES, INC., JOHN W. CHISHOLM, H. RICHARD WALTON, and ROBERT M. SCHMITZ,<br><br>    Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Caleb Ho ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Flotek Industries, Inc. ("Flotek" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants (defined below) who purchased or otherwise acquired Flotek securities between October 23, 2014 and November 9, 2015, inclusive (the "Class Period"),

seeking to recover compensable damages caused by Defendants' violations of the federal securities laws (the "Class").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 8 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

4.      Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as a substantial part of the conduct complained of herein occurred and the Company maintains its principal place of business and conducts business in this District.

5.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the attached Certification, acquired Flotek securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

7.      Defendant Flotek is a Delaware corporation with its principal place of business located at 10603 W. Sam Houston Parkway N., Suite 300, Houston, Texas. It is a global diversified, technology-driven company that develops and supplies oilfield products, services and equipment to the oil, gas and mining industries, and high value compounds to companies

that make cleaning products, cosmetics, food and beverages and other products that are sold in consumer and industrial markets. During the Class Period, the Company's stock was traded on the New York Stock Exchange ("NYSE") under the ticker symbol "FTK."

8.      Defendant John W. Chisholm ("Chisholm") served as the Company's President, Chief Executive Officer and Chairman of the Board at all relevant times.

9.      Defendant H. Richard Walton ("Walton") has served as the Company's Executive Vice President and Chief Financial Officer at all relevant times until his appointment as Chief Financial Officer Emeritus of the Company on May 29, 2015.

10.     Defendant Robert M. Schmitz ("Schmitz") has served as the Company's Executive Vice President and Chief Financial Officer since May 29, 2015.

11.     The defendants referenced above in ¶¶ 7-10 are sometimes referred to herein as the "Individual Defendants."

12.     Defendant Flotek and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

13.     Flotek is a diversified global supplier of drilling and production products and services to the energy and mining industries.

14.     Flotek's Complex nano-Fluid ("CnF") technology is a bio-based, nontoxic technology that is developed from citrus fruit, which is used to facilitate the extraction of oil from formations. CnF chemistries purportedly improve the productivity of oil and gas wells.

15.     FracMax is a one-of-a-kind, patent-pending mobile application designed by Flotek, which presents analytical data for hydraulically fractured wells across the United States.

16.     In May 2014, the Company launched FracMax, which allowed the Company to quantitatively demonstrate the benefits associated with the use of the Company's patented and proprietary CnF chemistries.

17.     In October 2014, the Company announced the formation of FracMax Analytics, LLC, a wholly owned subsidiary that will use the FracMax software platform to provide customized data analysis to oil and gas operators, investors and other companies.

**Materially False And Misleading Statements Issued During the Class Period**

18.     On October 22, 2014, the Company filed a Form 10-Q for the quarter ended September 30, 2014 (the "3Q 2014 10-Q") with the SEC, which provided the Company's quarterly financial results. The 3Q 2014 10-Q was signed by Defendants Chisholm and Walton. The 3Q 2014 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Chisholm and Walton, which stated that the financial information contained in the 3Q 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

19.     The 3Q 2014 10-Q touted FracMax, which states in part:

> The Company expects that competition for contracts and margins will remain intense in the future but believes that product innovation, service improvements and quantitative data from its FracMax™ technology will enable the Company to realize market share gains during the remainder of 2014 and into 2015.

20.     On January 27, 2015, the Company filed a Form 10-K for the fiscal year ended December 31, 2014 (the "2014 10-K") with the SEC, which provided the Company's year end financial results. The 2014 10-K was signed by Defendants Chisholm and Walton. The 2014 10-K contained signed SOX certifications by Defendants Chisholm and Walton, which stated that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

21.     The 2014 10-K touted FracMax, which states in parts:

The Company has integrated the use of the FracMax<sup>TM</sup> software technology into its sales and marketing activities resulting in a significant increase in interest in the Company's Complex nano-Fluid<sup>TM</sup> chemistries.

*       *       *

The Company also plans to continue to expand the capabilities and use of its patent pending FracMax<sup>TM</sup> software which should continue to enhance the Company's sales and marketing efforts by validating the production and economic benefits of the Company's core Complex nano-Fluid® chemistries.

*       *       *

Energy Chemical Technologies revenue for the year ended December 31, 2014 increased $67.8 million, or 33.8%, from the prior corresponding period. Excluding the incremental revenue impact of the Florida Chemical, EOGA and SiteLark acquisitions of $10.5 million, revenue increased $57.3 million, or 28.5%, compared with the prior corresponding period, primarily due to the increased sales of stimulation chemical additives, largely the result of the introduction of the Company's proprietary, patent-pending FracMax™ software which statistically demonstrates the positive production and economic impact of using Flotek's CnF® chemistries in unconventional well completions. The FracMax<sup>TM</sup> software has led to a record number of new validation projects and accelerated commercial acceptance of the Company's CnF® completion chemistries.

22.     On April 22, 2015, the Company filed a Form 10-Q for the quarter ended March 31, 2015 (the "1Q 2015 10-Q") with the SEC, which provided the Company's quarterly financial results. The 1Q 2015 10-Q was signed by Defendants Chisholm and Walton. The 1Q 2015 10-Q contained signed SOX certifications by Defendants Chisholm and Walton, which stated that the financial information contained in the 1Q 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

23.     The 1Q 2015 10-Q touted FracMax, which states in parts:

The Company also plans to continue to expand the capabilities and use of its patent pending FracMax<sup>TM</sup> software which should continue to enhance the Company's sales and marketing efforts by validating the production and economic benefits of the Company's core Complex nano-Fluid® chemistries.

The FracMax™ analytical platform is an innovative software technology that allows the Company to quantitatively demonstrate the benefits associated with the use of the Company's patented and proprietary Complex nano-Fluid® chemistries. The FracMax™ application has been integrated into the Company's sales and marketing process leading to new sales opportunities. In October 2014, the Company announced the formation of FracMax Analytics, LLC, a wholly owned subsidiary that will use the FracMax™ analytical platform to provide customized data analysis to oil and gas operators, investors and other companies.

*       *       *

The Company expects that competition for contracts and margins will remain intense but that product innovation, service improvements and data from its FracMax™ analytical platform will enable the Company to realize relative market share gains during the remainder of 2015 and into 2016.

*       *       *

Energy Chemistry Technologies revenue for the three months ended March 31, 2015, decreased $15.7 million, or 25.2%, relative to the comparable period of 2014. This reduction in revenue virtually mirrored the decrease in the North American active drilling rig count of 25.5% over the comparable periods. While eroding market conditions are the primary driver of the revenue decrease, Flotek has aggressively pursued strategic relationships with existing customers and has continued to promote the benefits of CnF® in completions and restimulation efforts by leveraging the quantitative evidence validated through the FracMax™ analytical platform. These strategic sales and marketing efforts are ensuring that Flotek remains a leader in the energy chemistry industry and is poised to take advantage of any market recovery.

24.     On July 22, 2015, the Company filed a Form 10-Q for the quarter ended June 30, 2015 (the "2Q 2015 10-Q") with the SEC, which provided the Company's quarterly financial results. The 2Q 2015 10-Q was signed by Defendants Chisholm and Schmitz. The 2Q 2015 10-Q contained signed SOX certifications by Defendants Chisholm and Schmitz, which stated that the financial information contained in the 2Q 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

25.     The 2Q 2015 10-Q touted FracMax, which states in parts:

The Company expects CnF® volumes to continue to outpace the overall industry activity level due to the distinctive advantage demonstrated by the patent pending FracMax™ analytical platform which provides quantitative validation of the

improved well economics achieved by utilizing CnF® as part of well completions.

\*     \*     \*

The Company also plans to continue to expand the capabilities and use of its patent pending FracMax™ software which will continue to enhance the Company's sales and marketing efforts by validating the production and economic benefits of the Company's core Complex nano-Fluid® chemistries.

The patent pending FracMax™ analytical platform is an innovative software technology that allows the Company to quantitatively demonstrate the benefits associated with the use of the Company's patented and proprietary Complex nano-Fluid® chemistries. The patent pending FracMax™ application has been integrated into the Company's sales and marketing process leading to new sales opportunities. In October 2014, the Company announced the formation of FracMax Analytics, LLC, a wholly owned subsidiary that will use the patent pending FracMax™ analytical platform to provide customized data analysis to oil and gas operators, investors and other companies.

\*     \*     \*

The Company expects that competition for contracts and margins will remain intense but that product innovation, service improvements and data from its patent pending FracMax™ analytical platform should enable the Company to realize relative market share gains during the remainder of 2015 and into 2016.

\*     \*     \*

Energy Chemistry Technologies revenue for the three months ended June 30, 2015, decreased $6.1 million, or 9.8%, relative to the comparable period of 2014, compared to a 51.0% decline in market activity as measured by average North American rig count. Revenue for the six months ended June 30, 2015, decreased $21.9 million, or 17.5%, relative to the comparable period of 2014, compared to a 37.5% decline in market activity. The Energy Chemistry Technologies segment substantially outperformed market activity indicators due to substantial increases in CnF® sales volumes during the quarter. CnF® sales volumes increased 76% for the three months ended June 30, 2015 compared to the three months ended March 31, 2015, and increased 34% compared to the three months ended June 30, 2014. The increased sales of CnF® during the second quarter of 2015 were due to Flotek's aggressive promotion of the benefits of CnF® in completions and re-stimulation efforts by leveraging the quantitative evidence provided through the patent pending FracMax™ analytical platform. These strategic sales and marketing efforts are ensuring that Flotek remains a leader in the energy chemistry industry and is poised to take even greater advantage of any market recovery.

26.   On September 11, 2015, the Company gave an investor presentation (the "September 11th Presentation"), which included the following slides attempting to show the efficacy of the Company's CnF technology by presenting production data of four proximate wells in Texas (Targac 1H, Gillespie 1H, Molnoskey 1H (Cnf) and Berger Unit 1H) from the FracMax database that purportedly came directly from the Texas Railroad Commission:



**FracMax**®

### About FracMax®



➢ Proprietary hydrocarbon production analytical model allowing comparison of completion technique efficacy.

➢ Based on Flotek's proprietary, patent pending **D**ata **R**ecovery **E**conometric **A**nalytical **M**odelling (DREAM) software, our proprietary FracMax® software uses public data – provided by oil and gas operators – to analyze production results based on completion methods.

➢ Data is sourced from operator-provided completion data from FracFocus and production data from government entities.

➢ The data is un-adjusted, providing for comparison and analysis of operators' self-reported data sets.

FLOTEK
Making a Difference. . .

\*      \*      \*

**FracMax®**





**FracMax®**



\*      \*      \*

# FracMax®





\*          \*          \*

# FracMax®





27.     On October 21, 2015, the Company filed a Form 10-Q for the quarter ended September 30, 2015 (the "3Q 2015 10-Q") with the SEC, which provided the Company's quarterly financial results. The 3Q 2015 10-Q was signed by Defendants Chisholm and Schmitz. The 3Q 2015 10-Q contained signed SOX certifications by Defendants Chisholm and Schmitz, which stated that the financial information contained in the 3Q 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

28.     The 3Q 2015 10-Q touted FracMax, which states in parts:

The Company expects CnF® sales to continue to outpace general oilfield activity as a result of the distinct benefits of CnF® in unconventional completions as demonstrated by the FracMax® analytical platform, which provides quantitative validation of the improved well economics achieved when CnF® is used in the well completion process.

*      *      *

The Company also plans to continue to expand the capabilities and use of its FracMax® analytical platform, an innovative software technology that allows the Company to quantitatively demonstrate the benefits associated with the use of the Company's patented and proprietary Complex nano-Fluid® chemistries. The FracMax® application has been integrated into the Company's sales and marketing process leading to new sales opportunities. In October 2014, the Company announced the formation of FracMax Analytics, LLC, a wholly owned subsidiary that will use the FracMax® analytical platform to provide customized data analysis to oil and gas operators, investors, and other companies. The Company believes the FracMax® platform, driven by DREAM™ technology, has applications beyond the energy sector and is exploring options to expand the reach of this innovative software platform.

*      *      *

The Company expects that competition for contracts and margins will remain intense but that product innovation, service improvements, and data from its FracMax® analytical platform should enable the Company to realize relative market share gains during the remainder of 2015 and into 2016.

*      *      *

Energy Chemistry Technologies revenue for the three months ended September 30, 2015, decreased $8.0 million, or 11.7%, relative to the comparable period of 2014, compared to a 53.9% decline in market activity as measured by average

North American rig count. Revenue for the nine months ended September 30, 2015, decreased $29.9 million, or 15.5%, relative to the comparable period of 2014, compared to a 43.2% decline in market activity. The Energy Chemistry Technologies segment substantially outperformed market activity indicators due to significant increases in CnF® sales volumes during the quarter. CnF® sales volumes increased 34% (revenues increased 32%) for the three months ended September 30, 2015, compared to the three months ended June 30, 2015. CnF® sales volumes increased 59% (revenues increased 18%), compared to the three months ended September 30, 2014. CnF® revenue increases for the year over year period were lower than volume increases due to implementation of incentive pricing structures associated with new strategic relationships in 2014. The increased sales of CnF® during the third quarter of 2015 were due to Flotek's aggressive promotion of the benefits of CnF® in completions and re-stimulation efforts by leveraging the quantitative evidence provided through the FracMax® analytical platform. These strategic sales and marketing efforts are ensuring that Flotek remains a leader in the energy chemistry industry and is poised to take even greater advantage of any market recovery.

29.     The statements referenced in ¶¶ 18-28 above was materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) FracMax contained data and process errors; (2) the reported production data from FracMax for three of the wells in the Company's September 11th presentation were inaccurate; (3) an application from the Company claiming to be FracMax made available in the Apple iTunes Store does not work; and (4) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Emerges

30.     On November 9, 2015, Australian analyst firm Bronte Capital published a report on Flotek (the "Bronte Capital Report") asserting, among other things, that: (1) the production data of Targac 1H, Gillespie 1H and Berger Unit 1H set forth in the September 11th Presentation

did not match the data in Texas Railroad Commission; and (2) a version of FracMax available in

the Apple iTunes Store does not work.

31.     With regards to the production, the Bronte Capital Report stated, in part:

**Targac 1H**

Targac 1H from Sabine Oil & Gas (API#: 42-285-33654) was selected for its location within four miles of the CnF-using Molnoskey 1H (see map on slide 58). Targac, said Chisholm, is an example of a large, expensive well that used substantial amounts of water.

Slide 59 shows production and additive data from FracMax:



Chisholm narrated at 1:07:20 in the replay:

> So that particular well there, here's what we want you to focus on. 11 million gallons were pumped in that frack job. Here's the initial production: eight thousand eight hundred barrels in the first month, no CnF in that well. 'Kay? 11 million gallons, 8800 barrels.

The RRC reports production data by RRC ID#, to which well API#s directly correspond for the four wells of concern to us. So first we look up the RRC ID using the API #:



Using the RRC's query tool, we lookup the RRC production data for lease ID# 10702.

Let's compare the numbers.

The table below shows, by month, the production data for oil and gas from Targac 1H. The first column under each of Oil and Gas headings, labeled "FTK – FracMax," reproduces the numbers as shown on Chisholm's slide above that was presented to investors. The middle column under each of the Oil and Gas headings, labeled "Texas RRC" shows the original production data (not disposition) as reported by the Texas RRC and reproduced in full above. The final column under each of the Oil and Gas headings simply divides the FracMax number into the Texas RRC number, stated as a percentage.

| Month | Oil (Bbl) | | | Gas (Mcf) | | |
|---|---|---|---|---|---|---|
| | FTK - FracMax | Texas RRC | % of RRC | FTK - FracMax | Texas RRC | % of RRC |
| Nov-13 | | 17,761 | | | 21,583 | |
| Dec-13 | 8,886 | 14,810 | 60.0% | 8,699 | 17,397 | 50.0% |
| Jan-14 | 6,431 | 10,719 | 60.0% | 8,555 | 17,110 | 50.0% |
| Feb-14 | 4,919 | 8,198 | 60.0% | 6,115 | 12,230 | 50.0% |
| Mar-14 | 4,552 | 7,586 | 60.0% | 5,935 | 11,869 | 50.0% |
| Apr-14 | 3,610 | 6,016 | 60.0% | 5,694 | 11,387 | 50.0% |
| May-14 | 2,902 | 4,836 | 60.0% | 4,692 | 9,383 | 50.0% |
| Jun-14 | 2,382 | 3,970 | 60.0% | 4,967 | 9,933 | 50.0% |
| Jul-14 | 2,209 | 3,681 | 60.0% | 4,619 | 9,238 | 50.0% |
| Aug-14 | 2,071 | 3,451 | 60.0% | 3,868 | 7,735 | 50.0% |
| Sep-14 | | 2,977 | | | 7,306 | |
| Oct-14 | | 2,678 | | | 7,411 | |
| Nov-14 | | 2,195 | | | 6,934 | |
| Dec-14 | | 2,092 | | | 7,206 | |
| Jan-15 | | 1,950 | | | 4,983 | |
| Feb-15 | | 2,058 | | | 4,702 | |
| Mar-15 | | 2,501 | | | 5,008 | |
| Apr-15 | | 1,719 | | | 3,969 | |
| May-15 | | 1,524 | | | 3,668 | |
| Jun-15 | | 1,369 | | | 3,846 | |
| Jul-15 | | 1,293 | | | 4,529 | |
| Aug-15 | | 1,165 | | | 4,208 | |

***Eagle-eyed readers—who no doubt share our commitment to correctness—will note several problems here.***

- ***The production data shown on Chisholm's slide does not match what was reported to the RRC.***

- ***The data appears to have been adjusted, as the numbers shown on the FracMax slide total only 60% of the oil production reported to the RRC and 50% of the gas.***

- The first month's oil production was not 8900 barrels in December 2013, but 17,761 in November 2013.

*Chisholm it seems understated production data for the well that contained none of Flotek's special "complex nano-fluid".*

*We gave John Chisholm the benefit of the doubt. We thought this could be a coding or data entry or a simple copy-paste error.*

*Alas we found that this is a pattern rather than isolated error.*

**Gillespie 1H**

Chisholm next presented the Gillespie 1H well (API# 42-285-33673), also from Sabine Oil and Gas, located nearby (see slide 60).

At 1:07:39 in the replay, Chisholm describes Gillespie 1H as a "clone" of the Targac 1H well, as Sabine used a similar set of chemicals:

> The operator, Sabine, then went and decided they needed to reduce the size of their jobs. And that's this well right here that they used a clone with. Focus in on this. They reduced the size of the job from 11 million gallons to eight; production went down, 5800 barrels instead of 8800.

Slide 61, reproduced below, shows the production reported by FracMax:



As before, we use the API#, 42-285-33673, to look up the Texas RRC ID #, which is 10811.



After retrieving the production data using ID # 10811, we find that Gillespie has the same undisclosed adjustment as Targac. Using the same table as we did for Targac, we compare the FracMax numbers from Flotek's slide and the original RRC data.

| Month | Oil (Bbl) | | | Gas (Mcf) | | |
|---|---|---|---|---|---|---|
| | FTK - FracMax | Texas RRC | % of RRC | FTK - FracMax | Texas RRC | % of RRC |
| May-14 | | 13,417 | | | 24,099 | |
| Jun-14 | 5,820 | 9,700 | 60.0% | 9,439 | 18,877 | 50.0% |
| Jul-14 | 4,885 | 8,142 | 60.0% | 8,400 | 16,800 | 50.0% |
| Aug-14 | 3,859 | 6,431 | 60.0% | 6,631 | 13,261 | 50.0% |
| Sep-14 | 3,463 | 5,772 | 60.0% | 5,906 | 11,811 | 50.0% |
| Oct-14 | 3,073 | 5,121 | 60.0% | 5,424 | 10,848 | 50.0% |
| Nov-14 | 2,677 | 4,462 | 60.0% | 5,090 | 10,179 | 50.0% |
| Dec-14 | 2,453 | 4,089 | 60.0% | 4,207 | 8,413 | 50.0% |
| Jan-15 | 2,140 | 3,566 | 60.0% | 4,063 | 8,125 | 50.0% |
| Feb-15 | 1,799 | 2,999 | 60.0% | 3,478 | 6,955 | 50.0% |
| Mar-15 | | 3,597 | | | 7,932 | |
| Apr-15 | | 2,983 | | | 7,039 | |
| May-15 | | 2,817 | | | 6,324 | |
| Jun-15 | | 2,516 | | | 6,485 | |
| Jul-15 | | 2,382 | | | 6,424 | |
| Aug-15 | | 2,197 | | | 6,052 | |

*Once again, the numbers don't match. Chisholm correctly notes that both water use and production at Gillespie 1H were lower than at Targac 1H.*

But what he didn't say was that his numbers did not match the official data from the Texas Railroad Commission: production was both a month earlier (May, not June) and substantially higher than he claimed.

### Molnoskey 1H

The Molnoskey 1H well, also by Sabine Oil & Gas, is the punchline of Chisholm's presentation of well comparisons using FracMax screenshots. This is the well that enjoyed the benefit (and pleasing citrus odour) of Flotek's complex nano-fluids, and the other wells were selected for comparison because they are near Molnoskey (slide 62).

Slide 63 shows the additives and production data as reported by FracMax:



Chisholm noted Flotek's complex nano-fluid sold under the trade name "Super Stim 120," and highlighted one ingredient, citrus terpenes. Chisholm then made the key, direct comparison between Molnoskey and Targac, the first well presented. At 1:08:04 in the replay, he stated:

> They [Sabine] then came to us and said, we're going to reduce it even further, in fact they called these wells "smurf" wells. And we're gonna run complex nano-fluid.

> Focus here on this. Volume six million gallons versus the original one [Targac] of over 11. Production 12.5 thousand gallons in the first month versus eight, so the production's up 50%, the fluid's down 50%, here's complex nano-fluid, in fact it's Super Stim 120, remember FDP? Super-stim in this case they happen to put citrus terpene in there.

This is the key to Flotek's claims of the value of CnF and its FracMax app. Given our experience so far, we should probably double check the numbers. We use API #42-285-33756 to retrieve the Texas RRC ID# of 10920.

18



But this time the RRC production data for ID# 10920 holds a surprise: while the first month was again omitted, it hasn't otherwise been adjusted at all. In other words, only for the well with CnF did Flotek report (mostly) the original, unadjusted RRC numbers:

| | Oil (Bbl) | | | Gas (Mcf) | | |
|---|---|---|---|---|---|---|
| Month | FTK - FracMax | Texas RRC | % of RRC | FTK - FracMax | Texas RRC | % of RRC |
| Jun-14 | | 18,436 | | | 35,398 | |
| Jul-14 | 12,594 | 12,594 | 100.0% | 25,935 | 25,935 | 100.0% |
| Aug-14 | 9,204 | 9,204 | 100.0% | 20,172 | 20,172 | 100.0% |
| Sep-14 | 6,922 | 6,922 | 100.0% | 16,486 | 16,486 | 100.0% |
| Oct-14 | 5,941 | 5,941 | 100.0% | 13,976 | 13,976 | 100.0% |
| Nov-14 | 5,041 | 5,041 | 100.0% | 14,305 | 14,305 | 100.0% |
| Dec-14 | 4,827 | 4,827 | 100.0% | 12,820 | 12,820 | 100.0% |
| Jan-15 | 4,136 | 4,136 | 100.0% | 12,306 | 12,306 | 100.0% |
| Feb-15 | 3,882 | 3,882 | 100.0% | 9,842 | 9,842 | 100.0% |
| Mar-15 | 4,109 | 4,109 | 100.0% | 9,204 | 9,204 | 100.0% |
| Apr-15 | | 3,407 | | | 7,420 | |
| May-15 | | 3,222 | | | 7,303 | |
| Jun-15 | | 2,881 | | | 6,760 | |
| Jul-15 | | 2,330 | | | 5,993 | |
| Aug-15 | | 2,180 | | | 5,041 | |

\*       \*       \*

**Berger 1H**

The final well Chisholm highlighted was the Berger 1H Unit from Devon Energy, a nearby well (slide 64) that he told us had no CnF. A screenshot from FracMax reports Berger's additives and production (slide 65):



Chisholm narrated at 1:08:43 in the replay:

> Wanted to show you the well right next door to that CnF well was with...by Devon.  Uh...amount of fluid 5.9 million, less than half the production. Right next door. To the well that had CnF in it, with a similar amount of fluid in the frack job. This type of data analysis was absolutely [sic] no way Flotek had access to it 'till we invented FracMax. Absolutely no one else in the industry has it.

Using the API#42-285-33802, we retrieve its RRC Lease ID#10972:



*As above, we look up the production data for Berger from the RRC using ID# 10972. Once again, Flotek's reported production data from FracMax does not match the RRC's, as the by-now-familiar table below shows:*

| Month | Oil [Bbl] | | | Gas (Mcf) | | |
|---|---|---|---|---|---|---|
| | FTK - FracMax | Texas RRC | % of RRC | FTK - FracMax | Texas RRC | % of RRC |
| Sep-14 | | 8,547 | | | 15,046 | |
| Oct-14 | | 12,817 | | | 16,140 | |
| Nov-14 | 5,022 | 8,370 | 60.0% | 3,936 | 7,872 | 50.0% |
| Dec-14 | 3,743 | 6,238 | 60.0% | 5,002 | 10,004 | 50.0% |
| Jan-15 | 2,946 | 4,910 | 60.0% | 4,880 | 9,759 | 50.0% |
| Feb-15 | | | | 10,036 | 20,071 | 50.0% |
| Mar-15 | 1,997 | 3,328 | 60.0% | 6,103 | 12,205 | 50.0% |
| Apr-15 | 2,371 | 3,952 | 60.0% | 6,605 | 13,210 | 50.0% |
| May-15 | 567 | 945 | 60.0% | 899 | 1,798 | 50.0% |
| Jun-15 | | 5,878 | | | 9,209 | |
| Jul-15 | | 3,182 | | | 9,465 | |
| Aug-15 | | 3,500 | | | 7,189 | |

Where before Flotek omitted the first month of production (usually the largest), in this case they have omitted the first two months of September and October 2014, as well as the most recently reported month, June 2015. And we find again the same undisclosed alteration of the RRC's data, as FracMax displays only 60% of the RRC's number for oil and 50% for gas.

Chisholm compared Berger and Molnoskey directly, as the two wells are nearby and used a similar amount of water, but only Molnoskey contained CnF. Berger, Chisholm said, had "less than half the production," presumably intending for his investor audience to conclude that CnF made the difference. While Molnoskey clearly produced more oil in its first 10 months, the difference is far less stark once the full RRC production numbers—including the missing months—are taken into account.

(Emphasis added).

32.     With regards to the version of FracMax available in the Apple iTunes Store, the

Bronte Capital Report stated, in part:

**Trying the FracMax App (?)**

A version of what claims to be FracMax is available in the Apple iTunes Store under the name "Flotek Max." Released on 17 February 2015, the description of the app fits the public descriptions of FracMax:



A quick but important caveat: we cannot know for certain if this is the app Chisholm demonstrated or the app used by Flotek's sales force. It is entirely possible—likely, even—that another version of FracMax exists. That said, our reading Apple's policies make it unlikely that a parallel private app exists.

With that caveat out of the way, we do what we can to try to use the app.

We find the same Flotek application pictured in the consumer app store above:



Clicking on the link leads us to the same page as before, except with "Volume Purchase Program" as the header:



(Note the section on "Managed Distribution" on the webpage above. It indicates that free apps are only available in bulk when using a "Mobile Data Management" solution, which implies control over the end user's iPad. This form of distribution would be more common within a single enterprise whose mobile devices are managed centrally.)

*Anyway, we downloaded the iTunes Store application—the first one shown, from the consumer app store—and tried to run it on two separate iPads, each running the latest version of iOS (one an iPad 4th Generation the other an iPad Mini 4).*

Here's what happened when we tried it, from the initial download onwards - note that this is a very boring video showing you what happened right to the point where the ipad crashed:

video1  



*On neither iPad we tried did the application work.* First, it asked for access to the camera, for what purpose we do not know. Next, it simply displayed a black screen with a set of red bubbles, much like the screenshot of the business card in the app store images above—except without any discernable image in the background. No amount of tapping or dragging or swiping or pinching could persuade it to do anything.

We would love if other readers could try to load the app. At last testing it crashed both our ipads.

This is curious as Flotek tells us that this app is responsible for the fantastic recent sales performance. (Also curious is the claim in the app store description that the data is updated weekly; as the images show, the latest version of the app was released on 17 February 2015.)

As we can't run FracMax—or an app from Flotek claiming to be FracMax, anyway—accuracy-minded investors like us can't check other wells. It would be fascinating if Mr Chisholm's faulty data is repeated over the whole United States. That would be deeply "curious".

And we like a good stock puzzle - especially one where the management seem to make it up.

(Emphasis added).

33.     On this news, shares of Flotek fell $3.50 per share or over 19% to close at $14.60 per share on November 9, 2015, damaging investors.

34.     On November 10, 2015, the Company issued a press release acknowledging data and process errors in FracMax database and the understatement of production data in the September 11th Presentation, stating in part:

> HOUSTON, Nov. 10, 2015 /PRNewswire/ In conjunction with Flotek Industries, Inc. ("Flotek" or the "Company) presentation at the Stephens, Inc. Fall Investment Conference in New York City, Flotek provides the following update on the ongoing development and evolution of the Company's FracMax® data analytics and visualization software application.
>
> Flotek has carefully reviewed a recent report regarding the validity of the data from the Company's FracMax® database by analyzing data from a small subset of wells in FracMax®. The analysis suggests the production data presented by Flotek – for three of the wells analyzed – were misinterpreted by Flotek and understated the production of those wells.
>
> "We take any contention of errors in our data, processes and analysis very seriously," said John Chisholm, Chairman, President and Chief Executive Officer of Flotek. "We appreciate the thorough analysis provided in the report and are using this critique as well as others to improve our FracMax® application to ensure both the validity and reliability of the underlying data as well as the accuracy of the analytical processes."
>
> As a result of our initial review of the report we have concluded that the FracMax® database – partly a result of third party data used by Flotek – identified the three wells in question to be contained in units with multiple wells (the state of Texas organizes production reporting by units, or leases, that report total production in the aggregate). The FracMax® application uses algorithms to assign production to individual wells within multiple well units. In this case, the report contends that the wells in question were on singlewell units and, as a result, 100% of the production from those units should be assigned to the identified wells. After

review of the report, data from the Texas Railroad Commission as well as other thirdparty data providers, it appears that the wells in question are singlewell units.

While the adjustment does impact the magnitude of the outperformance of the well completed using CnF® when compared to the nonCnF ® treated wells, it does not, the Company believes, change the conclusion that the CnF® well outperformed the nonCnF ® wells, especially when normalized for the length of the lateral completion zone.

"While we are concerned by the unintentional data and processing error that led to this unitization miscalculation and are taking aggressive steps to ensure this process is immediately corrected, our analysis of the wells in question concludes the use of CnF® improved productivity when compared to the neighboring wells that did not use CnF® in the completion process," said Chisholm. "Moreover, Sabine Oil & Gas – the operator of three of the wells in question – continues to use CnF® on its completions, an indication that Sabine's internal data show compelling benefits from the use of Flotek's Complex nanoFluids ® suite of completion chemistries."

The Company has conducted an initial review of the FracMax® database and has determined that this data and process error does not impact the vast majority of wells in the database which appear to be unitized appropriately by the software application. "In fact, there were several other wells in the investor presentation that were unitized and reported correctly, showing the benefits of CnF® that were not discussed or referred to in the report," added Chisholm.

"While FracMax® is an important tool in the development of new markets for CnF®, the most important determinant of the success of CnF® is the actual performance of the Company's completion chemistry in the wells of new and existing clients," said Chisholm. "The growth in validations that result in new commercial customers is the ultimate proof of the efficacy of our completion chemistries. Our clients and their experiences – as seen through their own proprietary production data – are by far the best evidence of the performanceenhancing nature of CnF®."

The number of production companies using CnF® in the completion process continues to grow with a consistent flow of validation projects for operators of all sizes.

35.    In the same press release, the Company stated the following with regards to the

FracMax:

**FracMax® Public Availability**

A final assertion made in the report claims that attempts to download FracMax® for personal use resulted in iPad malfunctions and no success in obtaining an

operating version of the software application. The author concludes that the program does not operate properly.

As the Company has consistently noted since inception, FracMax® is a proprietary software application for the exclusive internal use of Flotek employees. While the Company is preparing to release a new version of the software available for use by operators, FracMax® is not currently available outside of Flotek employees. A key code as well as other security requirements are necessary to obtain a working copy of the FracMax® application. This has been a consistent policy since FracMax® was introduced in 2014.

36.     On this news, shares of Flotek fell $5.56 per share or over 38% to close at $9.04

per share on November 10, 2015, further damaging investors.

37.     On November 11, 2015, Bronte Capital responded to the Company's November

10th press release, stating in part:

**Video Raises Doubts over Flotek's Most Recent Statements**

***Flotek (NYSE:FTK) put out an SEC filing in which they admitted the substantial points in my last blog post. The data that they presented proving the efficacy of FracMax was inconsistent with the official data at the Texas Railroad Commission and wrong.***

They argued that FracMax and their "complex nano-fluid" [CnF] worked nonetheless.

You can find the SEC filing here.

They however denied one suggestion in my original post. Flotek had long said that FracMax - an oil-field-database iPad app was a key to their sales success. However the iPad app crashed two iPads and clearly did not perform its stated function.

Here is what Flotek said in the SEC filing.

A final assertion made in the report claims that attempts to download FracMax® for personal use resulted in iPad malfunctions and no success in obtaining an operating version of the software application. The author concludes that the program does not operate properly.

As the Company has consistently noted since inception, FracMax® is a proprietary software application for the exclusive internal use of Flotek employees. While the Company is preparing to release a new version of the software available for use by operators, FracMax® is not currently available outside of Flotek employees. A key code as well as other security requirements

are necessary to obtain a working copy of the FracMax® application. This has been a consistent policy since FracMax® was introduced in 2014.

***In other words they stated that there is no version of FracMax available to people who are not FloTek employees.***

Here is a video that Flotek presented on their investment day in September.

video4



This video ends with a long claim for the benefit of FracMax. To quote:

> Now US and National Oil Companies can license a versions of the application customised to them on a FracMax centric Apple iPad which offers the ability to import specific reservoir and production software outputs for individual wells. Its associated FracMax Halo Technology enables selection of unique data fields for the particular user.

> With the Flotek FracMax app hundreds of hours worth of detailed and potentially expensive return on investment analysis is available with the touch of a screen.

> Its more impactful and convenient than ever to experience the real world benefit of CnF, an innovation that is revolutionising an industry by truly making a difference.

> You can touch it, you can see it, and now you can believe it. Your data has become intelligent in a way never imagined.

> The future is here.

***This version of FracMax is clearly available to non-Flotek employees.***

*I hope that Flotek can show us at least one modified version of FracMax useable by third parties. Or they can somehow explain away that video.*

*Or otherwise it is simple.*

*There is a major misrepresentation with likely severe legal ramifications.*

*And it will get ugly.*

(Emphasis added).

38.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

39.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Flotek securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

40.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Flotek securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Flotek or its transfer agent and may be notified of

the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

41.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

42.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

43.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Flotek;

- whether the Individual Defendants caused Flotek to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Flotek securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

44. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

45. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Flotek securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Flotek securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

46.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

47.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violations of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

48.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

49.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

50.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Flotek securities; and (iii) cause Plaintiff and other members of the Class to purchase or

otherwise acquire Flotek securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

51.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Flotek securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Flotek's finances and business prospects.

52.     By virtue of their positions at Flotek, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

53.     Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Flotek securities from their personal portfolios.

54.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Flotek, the Individual Defendants had knowledge of the details of Flotek's internal affairs.

55.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Flotek. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Flotek's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Flotek securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Flotek's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Flotek securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

56.     During the Class Period, Flotek securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Flotek securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise

acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Flotek securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Flotek securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

57.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

58.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**Violations of Section 20(a) of The Exchange Act**
**Against The Individual Defendants**

59.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

60.     During the Class Period, the Individual Defendants participated in the operation and management of Flotek, and conducted and participated, directly and indirectly, in the conduct of Flotek's business affairs. Because of their senior positions, they knew the adverse non-public information about Flotek's current financial position and future business prospects.

61.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Flotek's

business practices, and to correct promptly any public statements issued by Flotek which had become materially false or misleading.

62.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Flotek disseminated in the marketplace during the Class Period concerning the Company's business, operational and accounting policies. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Flotek to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Flotek within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Flotek securities.

63.     Each of the Individual Defendants, therefore, acted as a controlling person of Flotek. By reason of their senior management positions and/or being directors of Flotek, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Flotek to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Flotek and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

64.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Flotek.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as her reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: November 11, 2015                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Keith R. Lorenze
Keith R. Lorenze (Texas Bar No. 24046313)
Jacob Goldberg (not admitted)
101 Greenwood Avenue
Suite 203
Jenkintown, PA 19046
Tel: (215)-600-2817
Email: klorenze@rosenlegal.com

Phillip Kim, Esq. (not admitted)
Laurence M. Rosen, Esq. (not admitted)
275 Madison Avenue, 34th Floor
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

Michael Goldberg, Esq. (not admitted)
**GOLDBERG LAW PC**
13650 Marina Pointe Dr. Suite 1404
Marina Del Rey, CA 90292
Phone: 1-800-977-7401
Fax: 1-800-536-0065

Attorneys for Plaintiff