UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| CALEB HO, Individually and on Behalf of All Others Similarly Situated, | § | Civil Action No. 4:15-cv-03327 **(Consolidated)** |
| Plaintiff, | § | CLASS ACTION |
| vs. | § | |
| FLOTEK INDUSTRIES, INC., et al., | § | |
| Defendants. | § | DEMAND FOR JURY TRIAL |

**CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Lead Plaintiff Alaska Electrical Pension Fund ("plaintiff"), by and through its attorneys, alleges the following based upon personal knowledge as to itself and its own acts, and upon an investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of the U.S. Securities and Exchange Commission ("SEC") filings by Flotek Industries, Inc. ("Flotek" or the "Company"), Company releases, conference calls, public statements issued by defendants, media reports, analyst reports, industry reports, and consultation with persons familiar with Flotek's business. Plaintiff believes substantial additional evidentiary support will likely exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of purchasers of Flotek common stock between October 23, 2014 and November 9, 2015, inclusive (the "Class Period"), against Flotek, its President and Chief Executive Officer ("CEO") John W. Chisholm ("Chisholm"), and its Chief Financial Officers ("CFO") Robert M. Schmitz ("Schmitz") and H. Richard Walton ("Walton"), for violating §10(b) and §20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

## OVERVIEW

2. Flotek is a technologically driven company that develops and supplies oilfield products, including specialty chemicals and down-hole drilling and production equipment. Flotek's flagship products are its patented customized chemistries branded as Complex nano-Fluid technologies ("CnF" or "CnF products").

3. Flotek's CnF products are marketed and sold through the Company's Energy Chemistry Technologies segment, Flotek's largest segment in terms of revenue. During the Class Period, defendants claimed that Flotek's CnF products were unique chemical additives that could stimulate and significantly increase production in oil and gas wells and provide exploration and production companies ("E&P companies") millions of dollars in added revenues.

4. In the face of limited empirical data to support Flotek's claims about its CnF products, and industry skeptics as to CnF's efficacy and value, Flotek developed a proprietary sales and marketing application called FracMax, which defendants claimed provided "compelling evidence" of, and "conclusively" proved, the benefits of their CnF products. Defendants promoted FracMax by telling investors that by using publicly reported data from state government agencies, FracMax showed that CnF was effective and created value for E&P companies, which in turn created value for the Company's shareholders. During the Class Period, defendant Chisholm, one of FracMax's inventors and President and CEO of Flotek, repeatedly sold investors on CnF and FracMax, touting they were at the core of Flotek's future revenue growth and would sustain the Company through industry volatility.

5. Throughout the Class Period, defendants repeatedly reported on FracMax's success in "materially broaden[ing] the reach of Flotek's marketing efforts" and generating sales growth for the Company's CnF products. Unbeknown to investors, however, during the Class Period, Flotek was using false data in FracMax in its attempts to evidence that its CnF products were effective. In truth, Flotek was adjusting the publicly reported data in FracMax to falsely overstate the production impact of its CnF products.

6. Investors began to learn the truth about FracMax and Flotek's CnF products on November 9, 2015, when an investment firm, Bronte Capital Management Pty Ltd ("Bronte Capital"), published an online research report (the "Bronte Capital Report" or "Report") that called into question the accuracy of the FracMax data and the efficacy of CnF.[1] The Report alleged a pattern of false data in FracMax that overstated the production impact of CnF. Specifically, the Report accused Flotek of using false data at an investor conference that understated production rates

[1] Bronte Capital is an Australian-based global fund manager. Plaintiff alleges that the Bronte Capital Report was published in the United States on November 9, 2015, just before or at the time the market opened.

for non-CnF wells by 40% to 50%, to make Flotek's CnF products appear more effective than they actually were. The Bronte Capital Report stressed that "***the [FracMax] data looks like it was made up or at least systematically rigged***," making it "impossible to conclude that Flotek's [CnF products] do anything."

7. On this news, the price of Flotek common stock dropped over 19%, on an extraordinary volume of close to 16 million shares.

8. Flotek immediately responded to the Bronte Capital Report, denying any inaccuracies in the FracMax data. Within 24 hours, however, the Company changed its story and disclosed that the Bronte Capital Report was correct. The FracMax data for the non-CnF wells was in fact understated, making CnF look more effective than it actually was.

9. On the same day, November 10, 2015, defendants spoke at an analyst-hosted conference to give more detail on their story. During the conference call, Chisholm tried to blame the false data on analytical processing errors in FracMax software and purportedly erroneous data provided by a third party, Drillinginfo. Chisholm, however, admitted to knowing about the alleged analytical errors during the Class Period and admitted that the Company never verified the third-party data due to complete lack of internal controls.

10. Following defendants' November 10, 2015 disclosures, Flotek stock plummeted over 38%, the largest single day percentage decline in over a decade, on record volume of over 22 million shares.

11. Flotek's stock continued to decline after the Class Period as a result of defendants' fraud. On January 19, 2016, defendants announced: (i) the SEC had opened an inquiry related to the FracMax issue; (ii) the retention of a consultant to review the FracMax software and efficacy of CnF; and (iii) the formation of a special committee of independent directors to direct the review of

both issues. On this news, Flotek shares declined 25% on January 19, 2016, on a volume of over five million shares.

12. Throughout the Class Period, defendants' statements about CnF and FracMax were false and/or misleading and concealed that: (i) Flotek was using false data in FracMax in its attempts to evidence the efficacy and economic benefits of its CnF products, or alternatively, FracMax had database inaccuracies and analytic processing errors which were known to, or recklessly disregarded, by defendants, that made it impossible to conclude that CnF was effective; (ii) the Company lacked sufficient internal controls to verify the accuracy of the FracMax data; and (iii) as a result of the foregoing, the Company's statements about its business, operations, and prospects were false and misleading and/or lacked a reasonable basis.

13. As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of Flotek common stock, plaintiff and other Class members (as defined herein) have suffered significant losses and damages.

**JURISDICTION AND VENUE**

14. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5). This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

15. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and §27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. Additionally, Flotek's principal executive offices are located within this Judicial District.

16. In connection with the acts, transactions, and conduct alleged herein, defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

17. Lead Plaintiff Alaska Electrical Pension Fund purchased Flotek common stock at an artificially inflated price during the Class Period and, as a result of defendants' alleged misconduct, suffered damage as described in the Certification previously filed (Dkt. Nos. 17-2, 17-3) and incorporated herein.

18. Defendant Flotek is a Delaware corporation with its principal executive offices located at 10603 W. Sam Houston Parkway N., Suite 300, Houston, Texas 77064.

19. Defendant Chisholm is Chairman, President and CEO of Flotek, and held these positions throughout the Class Period. Chisholm was appointed CEO in March 2012 and has served as Flotek's President since August 2010. Chisholm has been a Director of the Flotek Board of Directors (the "Board") since November 1999, and has acted as Chairman of the Board since July 2010. As President and CEO, Chisholm spoke on Flotek's behalf in press releases, earnings conference calls, analysts/investor conferences and SEC filings during the Class Period. Chisholm also signed certifications attached to Flotek's SEC Forms 10-K and 10-Q filed during the Class Period. Chisholm has extensive experience in software development for the oil and gas industry, and is one of the inventors of Flotek's proprietary FracMax software. Chisholm founded the software development firm Wellogix, Inc. in 2001. Chisholm also co-founded and served as President of ProTechnics, a service company dedicated to providing state-of-the-art completion diagnostic services to the energy industry.

20. Defendant Schmitz has been Executive Vice President and CFO of Flotek since May 29, 2015. Schmitz served as the Company's Vice President and Corporate Controller from June 2013 through May 2015. Prior to joining Flotek, Schmitz served as Vice President and Chief Accounting Officer at Champion Technologies Inc., a major supplier of production chemicals to the oil and gas industry. Schmitz also worked at Shell Oil Company, ultimately serving as CFO of the Shell Energy Services division. Schmitz is a Certified Public Accountant. Schmitz signed certifications attached to the Forms 10-Q for 2Q 2015[2] and 3Q 2015 filed with the SEC during the Class Period. Schmitz also signed Flotek's Form 8-K filings during the Class Period.

21. Defendant Walton served as Executive Vice President and CFO from March 2013 until May 29, 2015, when he was appointed as CFO Emeritus of the Company. Prior to joining Flotek, Walton spent his entire 30-year career in public accounting, including 20 years as an audit partner at KPMG, LLP. His experience includes financial statement audits and registration of securities with the SEC. Following his retirement from KPMG, LLP in 2003, Walton served as a consultant to public companies, including Flotek since 2010. Walton is a certified public accountant. During the Class Period, Walton signed certifications attached to the 2014 Form 10-K and the Forms 10-Q for 3Q 2014 and 1Q 2015 filed with the SEC. Walton also signed Flotek's Form 8-K filings during the Class Period.

22. Defendants Chisholm, Schmitz and Walton are sometimes collectively referred to herein as the "Individual Defendants."

23. During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Flotek, were in possession of and privy to confidential and proprietary information concerning Flotek, its products, finances, financial condition, and present and future

---

[2] Flotek's fiscal quarters are abbreviated by quarter and year. For example, 2Q 2015 represents the second quarter of fiscal year ("FY") 2015. Flotek's fiscal year ends December 31.

business prospects for all of its product lines and business segments. Because of their positions as Flotek's senior-most executive officers, the Individual Defendants obtained, had access to and/or were in possession of material, adverse non-public information concerning Flotek via internal corporate documents and communications with other corporate officers and employees, attendance at management and/or Board meetings (and committees thereof), and via the reports, presentations and other information provided to them in connection therewith. As a result of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

24. At all times during the Class Period, Flotek was a publicly traded company whose common stock was registered with the SEC pursuant to the Exchange Act, and was actively traded on the New York Stock Exchange ("NYSE") and governed by the federal securities laws. Therefore, as senior executive officers and controlling persons of the Company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding Flotek's operations, business and financial statements, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Flotek common stock would be based upon truthful and accurate information. Defendants' materially false and misleading statements and omissions made during the Class Period violated these requirements and obligations.

## FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

### Complex nano-Fluid: The Company's Hallmark Product

25. Flotek has four operating segments: (1) Energy Chemistry Technologies (previously referred to as Energy Chemical Technologies); (2) Drilling Technologies; (3) Production Technologies; and (4) Consumer and Industrial Chemistry Technologies (previously referred to as Consumer and Industrial Chemical Technologies). Flotek's Energy Chemistry Technologies

segment is the Company's largest revenue producing segment, historically accounting for more than half of the Company's annual revenues.

26. Before and during the Class Period, the strong performance of the Energy Chemistry Technologies segment was attributed to Flotek's CnF products, which the Company claimed were cost effective additives that significantly increased the recovery and flow of hydrocarbons and increased profitability of wells within both oil and natural gas markets. The Company claimed that CnF was a powerful biodegradable additive that combined surfactant and solvent through the use of nanoparticle engineering and food-grade orange oil (also known as d-limonene).

27. Following the cyclical downturn that impacted the entire energy services business in 2008 and 2009, the Company undertook an aggressive rebuilding campaign that focused on increasing sales of its CnF products. In May 2013, the Company fortified its commitment to focusing on CnF products by acquiring Florida Chemical Company, one of Flotek's key suppliers for its CnF products and one of the world's largest processors of citrus oils and a global leader in citrus chemistry in the oilfield. The acquisition price of $106.4 million was funded through the issuance of 3.2 million shares of the Company's common stock and $53.7 million in cash.

28. During the Class Period, defendant Chisholm proclaimed that Flotek's CnF products were the Company's "hallmark" product and were the "key focus" of Flotek's leadership team. By the beginning of the Class Period, the Energy Chemistry Technologies segment represented over 50% of the Company's revenue due to sales of its CnF products.

29. Despite defendants' focus on CnF, by early 2014, Flotek was still far from reaching full market penetration for its CnF products in several key oil and gas basins in Texas and other states. Several factors were impacting the Company's ability to gain sales traction. Industry skeptics questioned whether Flotek's CnF products were effective or provided the high productivity claims being asserted by the Company. Similarly, E&P companies were also skeptical as to whether

the product created economic value for the high costs associated with its use. Also, as of early 2014, Flotek's sales force had limited empirical data to prove to the Company's customers and industry skeptics the purported efficacy and economic benefits of Flotek's CnF products. Moreover, the Company faced competition with multiple competing products in the market.

**FracMax: A Sales and Marketing Tool that Purportedly Evidenced the Benefits of Complex nano-Fluid**

30. In order to get past these hurdles and accelerate industry adoption of its CnF products, Flotek developed FracMax, a proprietary software application, which the Company introduced in 2Q 2014.

31. During the Class Period, defendants told investors that the FracMax software could "conclusively" validate the benefits of Flotek's CnF products, including their effectiveness and ability to create millions of dollars in economic value for Flotek's customers. According to defendants, FracMax did this through visualized presentations and analysis, on an iPad or laptop computer. Defendants claimed FracMax showed production comparisons of CnF wells versus non-CnF wells and profitability and economic opportunity associated with CnF, as well as potential lost revenues when not using CnF.

32. Defendants also claimed that FracMax was unique because its database was comprised of public information, primarily from FracFocus, a chemical disclosure registry that maintains data on chemicals used for hydraulic fracturing, and state regulatory agencies, that maintain well production data reported by E&P companies. For instance, with regard to production data in Texas, one of the leading oil producing states in the United States, defendants maintained that the Company downloaded public data from the Texas Railroad Commission and entered it into FracMax.

33. Defendants introduced the FracMax application to investors during a June 2014 investor day conference. Throughout the Class Period, defendants touted FracMax as an integral

component of Flotek's sales strategy and key to "materially broaden[ing] the reach of Flotek's marketing efforts" for its CnF products, as well as "fueling" its sales.

34. In October 2014, defendants announced the formation of FracMax Analytics, LLC, a wholly owned subsidiary that was created to use the FracMax software platform to provide customized data analysis to oil and gas operators, investors and other companies.

**Defendants Aggressively Promote**
**FracMax Software and Complex nano-Fluid**

35. Following FracMax's introduction, defendants commenced an aggressive campaign to sell investors on FracMax's ability to grow revenues for the Company. Over a 16-month period beginning in the second half of 2014, defendants attended at least 21 conferences, including Flotek's earning conference calls, analyst-hosted conferences and Company-hosted investor conferences, where they focused on and praised FracMax and its ability to conclusively validate the efficacy and economic benefits of Flotek's CnF products.

36. During the numerous investor conferences, defendants touted FracMax as a "premier analytical tool" in its ability to show the superiority of Flotek's CnF products. Market analysts were indeed impressed with Flotek's claims regarding the FracMax software, and they too believed it was a "powerful tool in the sales process" and would "revolutionize" sales of Flotek's CnF products.

37. Unlike other drilling analytics and simulation tools on the market prior to FracMax's introduction, defendants claimed that FracMax had a unique competitive advantage, not previously available in the industry, in that it could run "limitless production comparisons" which helped Flotek's customers better understand the "compelling benefit" of using CnF chemistry in the completion process.

38. During numerous Class Period conference calls, defendant Chisholm sold investors on the reliability of FracMax data, stating that:

> The concept and theory behind FracMax is fundamental: us[ing] publicly reported data from E&P companies themselves to verify the impact of CnF on production results by location. Very simply, using data from FracFocus and various state production databases, we take E&P companies' self-reported data and compare well production in the aggregate, by basin, from wells that use Flotek's CnF chemistry and those that don't.
>
> While innovative E&P brethren may buy into the story more rapidly than others, Flotek firmly believes operators will ultimately find it hard to ignore [their own] data which conclusively validates the economic advantage of using CnF chemistry in completions.

39. Defendant Chisholm himself, who was one of the inventors of FracMax, publicly claimed several times during the Class Period that "FracMax is the most compelling sales and value validation tool I have experienced in my three decades in this industry."

40. Multiple times during the Class Period, defendants also touted FracMax's large data set, telling investors that as a marketing tool, not only did FracMax provide compelling evidence of CnF's efficacy, it also allowed Flotek to demonstrate to customers the aggregate dollar benefit of using Flotek's CnF products. For example, by April 2015, defendants reported that the FracMax database included production data from 80,000 wells across key U.S. basins and that based on this data, Flotek's sales force could demonstrate to potential customers that the use of Flotek CnF chemistries added at least an estimated $8 billion in aggregate value for operators when compared to those operators that had not adopted Flotek's CnF products.

41. Defendants also told investors during the Class Period that FracMax could show its customers the lost potential revenues when CnF was not in use. For example, during a September 10, 2015 Barclays CEO Energy-Power Conference, defendant Chisholm stated that "[b]ased on data derived from FracMax, we estimate the operators have lost revenue potential of $70 billion – yes, billion with a B – dollars from not using CnF in their wells in just the Eagle Ford and Permian Basins alone," two of largest oil and gas developments in Texas.

**FracMax Significantly Accelerated Adoption of Complex nano-Fluid and Increased Flotek's Revenues**

42. Throughout the Class Period, defendants lauded FracMax for being instrumental in accelerating adoption of Flotek's CnF chemistries and significantly increasing CnF sales. During numerous industry and investor conferences, defendants repeatedly credited FracMax for helping "lead to the most robust prospect book in the history of the Company."

43. By the start of the Class Period, FracMax was already "successful in fueling interest in Flotek's [CnF products]" and had already made a "'marked impact'" on CnF sales during the quarter as "'more exploration and production companies than ever now know of and understand the substantial economic gains that result from the use of Flotek's [CnF products].'" In its 3Q 2014 earnings press release, Flotek reported an impressive 29.1% period-over-period increase in 3Q 2015 revenue for its Energy Chemistry Technologies segment due to increased sales of its CnF products.

44. Consistent with defendants' positive reports on the impact FracMax was having on CnF sales and customer interest, analysts at Stephens Inc. ("Stephens") issued a report on October 24, 2014 titled "Market Penetration Highlights Success of CnF." In the report, Stephens confirmed its outlook and valuation framework for Flotek as the Company "continues to demonstrate success with its core technology, CnF." The report also highlighted the CnF sales traction that the Company achieved as a result of FracMax, confirming that "[w]ith over a dozen validation programs added in 3Q, and 30+ running at 2Q end, the leading indicators are robust." The Stephens report also focused on FracMax as part of the Company's growth strategy for its CnF, stating that "[w]ith a strategy in place that is designed to continue the momentum in the marketplace, and a focus on science and technology that increases its customers' well economics, we believe Flotek provides a unique opportunity for investors."

45. FracMax continued to increase new customer growth and sales of Flotek's CnF products in 4Q 2014 and 1Q 2015. In Flotek's 4Q 2014 and FY 2014 earnings conference call, defendants reported a 32.9% period-over-period increase in revenues for Flotek's Energy Chemistry Technologies segment largely due to sales of CnF products generated by FracMax. During the conference call, Chisholm reported that "[a]s a direct result of FracMax," Flotek converted 20 exploration companies from validation clients to ongoing customers and that an additional 15 to 20 companies were in the process of conducting validations. Indeed, according to Chisholm, by 4Q 2014, the Company had a "record number" of both new validation projects and corporate inquires for its CnF products as a direct result of FracMax.

46. Despite declining oil prices and massive spending cuts from exploration and production companies in early 2015, in Flotek's 1Q 2015 earnings press release and conference call the Company reported that FracMax was continuing to have a "marked impact" on CnF sales, and "led to continued growth in new customers in the first quarter." In addition, during Flotek's 1Q 2015 earnings conference call, defendants reported on several more of FracMax's successes, including that: (i) due to FracMax, Flotek had a near 100% conversion rate for converting validation customers to ongoing users of the Company's CnF products; (ii) FracMax shortened the sales cycle for CnF products from up to two months to 30 days; and (iii) 30 new validations were initiated in the quarter due largely to FracMax, which was nearly double the number reported in the first half of 2014.

47. In 2Q 2015 and 3Q 2015, FracMax continued to drive CnF market share gains and sales. In Flotek's 2Q 2015 earnings press release, defendants reported that sales volumes of CnF increased 76% from the prior quarter and 34% for year-over-year due to FracMax, stating: "[D]ue to Flotek's aggressive promotion of the benefits of CnF in completions and re-stimulation efforts by

leveraging the quantitative evidence demonstrated through the patent pending FracMax analytical platform."

48. Similarly, in Flotek's 3Q 2015 earnings press release, defendants reported another impressive quarter of increased CnF sales due to FracMax's data. In 3Q 2015, CnF sales volumes increased 34% for the quarter compared to 2Q 2015 and 59% compared to year-over-year.

**FracMax Was Also Key to Sustaining Flotek's Growth During Industry Volatility**

49. During the Class Period, defendants assured investors that because of FracMax, sales of its CnF products would continue to grow, thereby insulating the Company from declining oil prices.

50. By the summer of 2014, oil prices had begun to fall, dropping over 50% by late 2014. Flotek's Energy Chemistry Technologies segment, however, continued to grow due to CnF sales and new validation projects, while the Company's other segments did not. Because of increasing CnF sales, by 3Q 2015, the Energy Chemistry Technologies segment remained the biggest contributor to Flotek's bottom line, accounting for over 100% of the total segment operating income in the quarter, while the Company's other segments suffered.

51. In December 2014, Chisholm assured investors during a Cowen and Company conference that "Flotek is relatively insulated from energy commodity price volatility" because of FracMax and its purported ability to prove CnF's benefits.

52. Defendants repeatedly attributed the Energy Chemistry Technologies segment's stellar performance to FracMax. For instance, during a June 24, 2015 industry conference, Chisholm stated:

> [O]ur energy chemistry business, for example, continues to grow even as completion activity weakens, a result of continued market share growth and the power of FracMax, our proprietary Big Data analytical software, which shows – using producers' own empirical data – the compelling economic benefits of our customized chemistry.

53. As alleged in the following paragraphs, throughout the Class Period while defendants were aggressively promoting FracMax and its ability to prove CnF's efficacy and economic benefits, and touting the positive impact both were having on Flotek's sales and revenue growth, defendants knew, or recklessly disregarded, that FracMax software contained false data that misrepresented the efficacy and economic benefits of CnF, making the product look more effective than it actually was.

54. As a result of defendants' false and misleading statements and omissions as detailed below, Flotek stock traded at artificially inflated prices during the Class Period. When the truth about FracMax and CnF began to emerge, the market value of Flotek stock declined dramatically, causing plaintiff and the other Class members to suffer significant losses and damages.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

### 3Q 2014 Earnings Release, SEC Form 10-Q and Conference Call

55. The Class Period begins on October 23, 2014. On the day prior, after the market closed, Flotek issued a press release reporting its 3Q 2014 earnings results. In the press release, Flotek reported that revenues in its Energy Chemistry Technologies segment increased 32% compared to 3Q 2013 due to increased sales of Flotek's CnF products.

56. In the press release, defendant Chisholm confirmed that although FracMax had made its debut just three months earlier in 2Q 2014, it was already having a "'marked impact'" on CnF sales and had already "'transformed [Flotek's] marketing efforts.'"

57. In the press release, defendants further commented on FracMax's successes during the quarter, stating that it "has been successful in fueling interest in Flotek's innovative chemistries."

58. In the press release, Chisholm added that due to the "'robust data in FracMax'" during the quarter, Flotek "'added over a dozen validation projects in addition to those already in progress and have a similar number in the planning stages.'"

59. On October 23, 2014, Flotek filed the press release with the SEC on Form 8-K which was signed by defendant Walton.

60. On October 22, 2014, after the market closed, the Company also filed its Quarterly Report with the SEC on Form 10-Q for 3Q 2014, in which the Company reiterated Flotek's financial results for the quarter and discussed FracMax. The Company's Form 10-Q was signed by defendants Chisholm and Walton.

61. The Form 10-Q touted FracMax's ability to "quantitatively demonstrate the benefits" associated with using the Company's CnF products and confirmed that FracMax has been integrated into the Company's sales and marketing process.

62. The Form 10-Q also provided a positive outlook for the remainder of 2014 and 2015 due to FracMax's capabilities. The Form 10-Q stated:

> The Company expects that competition for contracts and margins will remain intense in the future but believes that product innovation, service improvements and quantitative data from its FracMax™ technology will enable the Company to realize market share gains during the remainder of 2014 and into 2015.

63. On October 23, 2014, defendants held an earnings conference call with investors during which they reiterated Flotek's financial results for the quarter and continued to praise FracMax and the direct impact the application was having on growing sales and gaining market penetration for Flotek's CnF products. During the call, defendant Chisholm stated:

> The introduction of FracMax the company's patent pending application for comparing the performance of wells using Flotek's advanced net generation CnF completion chemistries versus those that use conventional surfactants or nothing at all continues to be uniquely successful in fueling interest in Flotek's innovative chemistries. As a direct result of FracMax, Flotek added over a dozen meaningful commercial chemistry validation projects with over a dozen prospective clients across multiple domestic basins.
>
> * * *
>
> FracMax and our effective sales team have not only gained traction in basins in which Flotek has a strong presence but more importantly, our growth is taking hold in basins across North America.

64. During the call, Chisholm extolled FracMax as the most compelling marketing tool he has seen in 30 years in the oil and gas industry and that FracMax "conclusively validates" the benefits of Flotek's CnF products. In the conference call, Chisholm stated:

> As indicated just three months ago, ***FracMax is one of the most compelling sales and value validation tools I have experienced in my three decades in this industry and we believe operators will find it hard to ignore their own data which conclusively validates the economic advantage of using CnF chemistries in completions***.

65. During the analyst question-and-answer portion of the conference call, defendant Chisholm touted FracMax as the "the most exact system of record" and confirmed FracMax's ability to validate the benefits of Flotek's CnF products. During the call, Chisholm stated:

> I believe, on the FracMax analytics that are providing us the data that from our perspective is the ***most exact system of record that specificity of completion additives and corresponding production in this industry in North America. We now have 66,000 plus wells that have [FracFocus] data on them over the last three years with corresponding production across every basin in the country. And again, I think one of our side objectives is to have that become the de facto standard of accurate information with respect to additives and are you able to illustrate value***.
>
> * * *
>
> Our message is always very consistent. Whether it's $105 a barrel or $85. And that is, ***if you can validate the value you should strongly consider using that technology, whatever it is***.
>
> ***And the unique thing with Flotek is we can validate the value. Whether it's our CnF chemistries through FracMax*** or our downhole sensors that are embedded in a couple of our more technical drilling tools.

66. Analysts reacted positively following defendants' statements. On October 23, 2014, Barrington Research Associates, Inc. ("Barrington") published positive analysis of Flotek's third quarter earnings, noting that 3Q 2014 adjusted earnings met consensus, and confirming that "FracMax, [Flotek's] patent pending software application for comparing the performance of wells using [Flotek's] advanced next-generation CnF completion fluids compared to conventional surfactants, is generating increased interest and requests for [CnF] validation programs." Barrington

expected FracMax "to continue to help convince customers across all basins and geographies of the benefits of using CnF products."

67. On October 24, 2014, market analyst Stephens also issued a positive report noting Flotek's continued success with "its core technology, CnF." Stephens confirmed that based on CnF's success, Flotek's "top line growth story is fully intact." Stephens' analysts also viewed defendants' commentary around CnF sales traction in as positive, confirming Flotek's report that 12 new validation programs were added in 3Q 2014 because of FracMax.

68. Defendants' October 22 and 23, 2014 statements regarding CnF and FracMax were materially false and misleading when made. During the Class Period, defendants knew, or recklessly disregarded and failed to disclose that:

(a) FracMax provided no support for the Company's claims that CnF was an effective product or provided economic value;

(b) Flotek was using false data in FracMax in its attempt to evidence the efficacy and economic benefits of its CnF products. During the Class Period, Flotek was adjusting the publicly reported data used in FracMax's software to falsely overstate the production impact of the Company's CnF products;

(c) Alternatively, defendants knew, or recklessly disregarded, that FracMax software had data inaccuracies and analytical processing errors that caused miscalculations of production data, thereby making it impossible to conclude that Flotek's CnF products were effective. During the Class Period, FracMax software did not have an accurate system for determining the correct number of wells attributable to a particular lease or unit, which caused inaccuracies in the FracMax database and caused the software to generate false data about CnF productivity in states like Texas where total production was reported by lease or unit;

(d) Flotek had no internal controls in place to ensure the integrity of the FracMax database. Defendants admitted that Flotek knowingly used unverified well count data from a

third-party provider, Drillinginfo, in the FracMax database. At the end of the Class Period, Chisholm admitted the Company lacked sufficient internal controls, stating, "we should have had the quality control in place that could have validated [the Drillinginfo data] and it wasn't, and it is now." Chisholm further added, "we should have cross-referenced [the Drillinginfo data] with the [Texas] Railroad Commission data and we didn't do that"; and

(e) As a result of (a)-(d) above, the Company's statements about its sales and revenue growth, validation projects, validation project pipeline and other business prospects were materially false and misleading and were made without any reasonable basis.

**4Q/FY 2014 Earnings Release**
**SEC Form 10-K and Conference Call**

69. On January 27, 2015, the Company issued a press release reporting 4Q 2014 and FY 2014 earnings results, which again included impressive revenue growth for both periods, primarily due to increased sales of Flotek's core CnF products. The press release reported that the Energy Chemistry Technologies segment generated revenue for 4Q 2014 of $75.6 million, an increase of 32.9% compared to 4Q 2013, and total revenue of $268.8 million for FY 2014, an increase of 33.8% from FY 2013. The press release credited the FracMax application for the impressive growth in CnF sales during 4Q 2014 and FY 2014, and in particular, its ability to "statistically demonstrates the positive production and economic impact of using Flotek's CnF chemistries in unconventional well completions." The press release further confirmed that "FracMax has led to a record number of new validation projects and accelerated commercial acceptance of the Company's CnF completion chemistries."

70. The press release also attributed 20 customer validation conversions to FracMax during 4Q 2014 and its ability to demonstrate the efficacy of CnF, stating: "As a result of FracMax, the Company has converted approximately 20 exploration companies from validation clients to ongoing commercial users."

71. In the press release, Chisholm confirmed that FracMax provided "conclusive evidence" of the benefits of CnF and was the "'hallmark'" of Flotek's growth strategy, stating:

> "***Our FracMax software technology provides conclusive evidence that our Complex nano-Fluid suite of completion chemistries provides compelling economic benefits to production companies***," added Chisholm. "Regardless of the position of the cycle, the economic value of Flotek's completion chemistries is compelling given the empirical data available through FracMax, now a hallmark of our growth strategy in the coming year and beyond. We are confident as more producers become aware of the economic benefit of CnF chemistries, the value creation impact will accelerate meaningfully."

72. In the press release, defendants also announced the introduction of FracMax Canada with approximately 10,000 wells, stating "[t]he Company's penetration into Canada continues to accelerate with nearly every Canadian-based pressure pumping company now pumping CnF completion chemistries in a number of projects."

73. On January 28, 2015, Flotek filed the press release with the SEC on Form 8-K, which was signed by defendant Walton.

74. On January 27, 2015, the Company filed its Annual Report with the SEC on Form 10-K for the 2014 fiscal year, in which the Company reiterated its financial results for 4Q 2014 and FY 2014. The Company's Form 10-K was signed by defendants Chisholm and Walton and contained the required Sarbanes-Oxley certifications, signed by defendants Chisholm and Walton.

75. The 2014 Form 10-K commented on FracMax and its ability to quantitatively demonstrate and validate the benefits of CnF, stating in part:

> In May 2014, the Company launched its patent pending FracMax™ software technology that allows the Company to quantitatively demonstrate the benefits associated with the use of the Company's patented and proprietary Complex nano-Fluid™ chemistries. The Company has integrated the use of the FracMax™ software technology into its sales and marketing activities resulting in a significant increase in interest in the Company's Complex nano-Fluid™ chemistries.
>
> * * *
>
> The Company also plans to continue to expand the capabilities and use of its patent pending FracMax™ software which should continue to enhance the Company's sales and marketing efforts by validating the production and economic benefits of the Company's core Complex nano-Fluid® chemistries.

76. The 2014 Form 10-K confirmed that in 4Q 2014, FracMax "has led to a record number of new validation projects and accelerated commercial acceptance of the Company's CnF® completion chemistries."

77. On January 28, 2015, defendants held an earnings conference call with investors. Defendants Chisholm and Walton actively participated during the conference call. During the call, defendants reiterated 4Q 2014 and FY 2014 financial results, again crediting the Company's revenue acceleration primarily to increased sales of the Company's CnF products.

78. During the call, Flotek attributed the Energy Chemistry Technologies segment's period-over-period revenue growth to the increased sales of CnF products, largely as a result of "the Company's proprietary patent-pending FracMax software, which statistically demonstrates the positive production and economic impact of using Flotek's CNF chemistries in unconventional well completions."

79. Chisholm spoke during the conference call and also told investors that FracMax was instrumental in gaining market share for Flotek's CnF products. During the call, Chisholm stated:

> [FracMax] continues to be uniquely successful in fueling interest in Flotek's innovative chemistries. As noted in last night's release, the FracMax database continues to grow, now with data from over 75,000 wells across key US basins.

80. Chisholm also credited FracMax for providing compelling evidence that Flotek's CnF products increase economic benefits compared to wells that do not use Flotek's CnF. During the call, Chisholm stated:

> Not only does such a larger database give us compelling evidence of the CNF on production, it also allows us to estimate the aggregate economic benefit of CNF usage for our clients. Based on data derived from FracMax, we estimate the use of Flotek's CNF Completion Chemistries has added at least $8 billion in aggregate value for operators, when compared to those operators that have not adopted CNF Chemistry.

81. During the call, Chisholm also discussed the successes of FracMax in growing sales of Flotek's CnF products, stating:

> Most important, FracMax has materially broadened the reach of Flotek's marketing efforts. As a direct result of FracMax, the Company has converted approximately 20 exploration companies from validation clients to ongoing commercial users.
>
> Currently, the Company has an additional 15 to 20 companies in the process of conducting or designing validations. In addition, there are approximately a dozen other unique validations that are in the scheduling process.
>
> As such, in total, we are in a record number of validations on the board. Largely a result of the compelling data contained in our FracMax analytical software.
>
> * * *
>
> In addition to the validations discussed above, we continue to have a record number of corporate inquiries regarding our Complex nano-Fluid Chemistries and FracMax analysis. As such, the pipeline of new validations continues to be robust. Moreover, the number of wells involved currently in validations, is at an all-time record.
>
> There are currently 45 wells involved in active, ongoing validations, and approximately 110 wells scheduled to enter the validation process in the coming weeks.

82. During the call, Chisholm again extolled FracMax as the most compelling marketing tool he has seen in 30 years in the oil and gas industry and that FracMax "conclusively validates" the benefits of Flotek's CnF products. In the conference call, Chisholm stated:

> As I indicated, when we conceived this powerful validation tool, FracMax is the most compelling sales and value validation tool I have experienced in my three decades in this industry. And we believe operators are finding it hard to ignore their own data, which conclusively validates the economic advantage of using CNF Chemistry in completions.

83. During the conference call, Chisholm also confirmed that in addition to generating CnF sales growth and market penetration, FracMax was shortening the sales cycle of Flotek's CnF products from several months to several weeks, which had a significant positive impact on the Company's revenue. Moreover, Chisholm confirmed that FracMax was instrumental in increasing the conversion rate of validation projects to commercial customer purchasers of Flotek's CnF products by as much as 10%. Indeed, in responding to market analysts' questions concerning the profile of those customers that converted from validation projects to CnF commercial purchasers due to FracMax, Chisholm stated during the call that "[e]very one of those validations that have been

concluded and are underway are new clients to Complex nano-Fluid. And, almost without exception, every one of them is a result of seeing the production profiles under the public data with FracMax."

84. On January 28, 2015, Barrington published positive commentary reflecting Flotek's "solid" December quarter, with sequential growth of the Energy Chemistry Technologies segment of 10.9%, reaching $75.6 million. Barrington further highlighted Flotek's introduction of their proprietary FracMax application, noting that it had "increased interest in CnF® chemistries." Barrington repeated Company claims that "based on FracMax data, the use of Flotek's CnF® completion chemistries has added at least $8 billion in aggregate value for operators compared to those who have not adopted the chemistries."

85. On January 28, 2015, Stephens also published positive commentary on 4Q 2014, stating that earnings were "driven primarily by strong Energy Chemical Tech. sales of $75.6 mil. which represents an 11% sequential increase and a 33% year-on-year increase." Stephens added that approximately 20 customer validation conversions were attributable to "the effectiveness of FracMax data."

86. Defendants' January 27 and 28, 2015 statements regarding CnF and FracMax were materially false and misleading when made. During the Class Period, defendants knew, or recklessly disregarded, and failed to disclose, that:

(a) FracMax provided no support for the Company's claims that CnF was an effective product or provided economic value;

(b) Flotek was using false data in FracMax in its attempt to evidence the efficacy and economic benefits of its CnF products. During the Class Period, Flotek was adjusting the publicly reported data used in FracMax's software to falsely overstate the production impact of the Company's CnF products;

(c) Alternatively, defendants knew, or recklessly disregarded, that FracMax software had data inaccuracies and analytical processing errors that caused miscalculations of production data, thereby making it impossible to conclude that Flotek's CnF products were effective. During the Class Period, FracMax software did not have an accurate system for determining the correct number of wells attributable to a particular lease or unit, which caused inaccuracies in the FracMax database and caused the software to generate false data about CnF productivity in states like Texas where total production was reported by lease or unit;

(d) Flotek had no internal controls in place to ensure the integrity of the FracMax database. Defendants admitted that Flotek knowingly used unverified well count data from a third-party provider, Drillinginfo, in the FracMax database. At the end of the Class Period, Chisholm admitted the Company lacked sufficient internal controls, stating, "we should have had the quality control in place that could have validated [the Drillinginfo data] and it wasn't, and it is now." Chisholm further added, "we should have cross-referenced [the Drillinginfo data] with the [Texas] Railroad Commission data and we didn't do that"; and

(e) As a result of (a)-(d) above, the Company's statements about its sales and revenue growth, validation projects, validation project pipeline and other business prospects were materially false and misleading and were made without any reasonable basis.

**1Q 2015 Earnings Release, SEC Form 10-Q and Conference Call**

87. On April 22, 2015, the Company issued a press release reporting its 1Q 2015 earnings results. In the press release, the Company's reported 1Q 2015 revenue for its Energy Chemistry Technologies segment was $46.6 million, a decrease of 25.2% from the prior period quarter, due to eroding market conditions.

88. While the Company was disappointed with its 1Q 2015 results, in the press release, defendant Chisholm stated that FracMax was continuing to have a marked impact on CnF sales and

the Company remained "'acutely focused'" on FracMax, "'building our empirical data base supporting the efficacy of our world class chemistry.'"

89. Defendant Chisholm also told investors that despite industry headwinds, FracMax led to continued growth of new CnF customers in 1Q 2015. The press release stated:

> "The power of FracMax™ combined with the efforts of our sales and marketing team with E&P companies, the ultimate beneficiaries of our chemistry technology, led to continued growth in new customers in the first quarter, even with the severe headwinds in the industry," added Chisholm. "With now over 40 active validations and over 230 unique beneficiaries of our advanced completion chemistry technology, CnF® is certainly much more than a science project; it is a proven method to maximize productivity and improve returns on investment for E&P companies interested in optimizing value."

90. On April 23, 2015, Flotek filed the press release with the SEC on Form 8-K, which was signed by defendant Walton.

91. On April 22, 2015, the Company filed its Quarterly Report with the SEC on Form 10-Q for 1Q 2015, in which the Company reiterated its financial results for the quarter. The Company's Form 10-Q was signed by defendants Chisholm and Walton and contained the required Sarbanes-Oxley certifications, also signed by defendants Chisholm and Walton.

92. The 1Q 2015 Form 10-Q discussed FracMax, stating in part:

> The Company also plans to continue to expand the capabilities and use of its patent pending FracMax™ software which should continue to enhance the Company's sales and marketing efforts by validating the production and economic benefits of the Company's core Complex nano-Fluid® chemistries.
>
> The FracMax™ analytical platform is an innovative software technology that allows the Company to quantitatively demonstrate the benefits associated with the use of the Company's patented and proprietary Complex nano-Fluid® chemistries. The FracMax™ application has been integrated into the Company's sales and marketing process leading to new sales opportunities.
>
> * * *
>
> The Company expects that competition for contracts and margins will remain intense but that product innovation, service improvements and data from its FracMax™ analytical platform will enable the Company to realize relative market share gains during the remainder of 2015 and into 2016.

93. On April 23, 2015, defendants held an earnings conference call with investors. Defendants Chisholm and Walton actively participated in the conference call. During the call, defendants reiterated Flotek's 1Q 2015 financial results. During the call, Chisholm again reported that FracMax "***continues to be uniquely successful in fueling interest in Flotek's innovative chemistries***."

94. During the conference call, Chisholm reaffirmed that FracMax provides "compelling evidence" of CnF's value, stating:

> ***Not only does such large database give us compelling evidence of the impact of CnF on productions, it also allows us to estimate the aggregate economic benefit of CnF usage or clients***.
>
> ***Based on data derived from FracMax, we estimate the use of Flotek's CnF completion chemistries have added at least $8 billion in aggregate value for operators***, when compared to those operators that have not adopted CnF chemistry.

95. During the call, Chisholm again extolled FracMax as the most compelling marketing tool he has seen in 30 years in the oil and gas industry and that FracMax "conclusively validates" the benefits of Flotek's CnF products. In the conference call, Chisholm stated:

> As I indicated when we conceived this powerful validation tool, ***FracMax is the most compelling sales and value validation tool I have experienced in my three decades in this industry, and we believe operators are finding it hard to ignore their own data, which conclusively validates the economic advantage of using CnF chemistry in completions***.

96. During the call, Chisholm also told investors that because of FracMax's database, Flotek was able to expand its customer base during 1Q 2015 to include direct sales to a number of exploration and production companies on re-stimulation projects, a customer base Flotek was not previously able to penetrate without FracMax. During the call, Chisholm stated:

> During the quarter, ***Flotek expanded the use of CnF in restimulation projects***. The company is actively working directly with a number of exploration and production companies to design and execute restimulation projects that needs higher concentrations of CnF, in conjunction with coil tubing and pumping units to revitalize production in maturing unconventional wells.

* * *

> ***The vast majority of these wells were not originally completed using CnF. Today however, using FracMax, we can empirically show the operator, the impact CnF can have on production levels from used and restimulation projects***. Giving operators a rare chance to take a second bite at the orange.

97. Defendants' April 21 and 22, 2015 statements regarding CnF and FracMax were materially false and misleading when made. During the Class Period, defendants knew, or recklessly disregarded, and failed to disclose, that:

(a) FracMax provided no support for the Company's claims that CnF was an effective product or provided economic value;

(b) Flotek was using false data in FracMax in its attempt to evidence the efficacy and economic benefits of its CnF products. During the Class Period, Flotek was adjusting the publicly reported data used in FracMax's software to falsely overstate the production impact of the Company's CnF products;

(c) Alternatively, defendants knew, or recklessly disregarded, that FracMax software had data inaccuracies and analytical processing errors that caused miscalculations of production data, thereby making it impossible to conclude that Flotek's CnF products were effective. FracMax could not accurately determine the correct number of wells attributable to a particular lease or unit, which caused inaccuracies in FracMax's CnF versus non-CnF well comparisons;

(d) Flotek had no internal controls in place to ensure the integrity of the FracMax database. Defendants admitted that Flotek knowingly used unverified well count data from a third-party provider, Drillinginfo, in the FracMax database. At the end of the Class Period, Chisholm admitted the Company lacked sufficient internal controls, stating, "we should have had the quality control in place that could have validated [the Drillinginfo data] and it wasn't, and it is now." Chisholm further added, "we should have cross-referenced [the Drillinginfo data] with the [Texas] Railroad Commission data and we didn't do that"; and

(e) As a result of (a)-(d) above, the Company's statements about its sales and revenue growth, validation projects, validation project pipeline and other business prospects were materially false and misleading and were made without any reasonable basis.

**2Q 2015 Earnings Release, SEC Form 10-Q and Conference Call**

98. On July 22, 2015, the Company issued a press release announcing Flotek's 2Q 2015 financial results. The press release reported revenue from Flotek's Energy Chemistry Technologies segment of $56.5 million for 2Q 2015, a sequential increase of 21%. The press release also explained that the Energy Chemistry Technologies segment substantially outperformed the market activity indicators (as compared to a 51% decline in market activity as measured by average North American rig count) due to substantial increases in CnF sales volumes during the quarter, stating, "the increase in sequential revenue was driven almost entirely by increased sales of Flotek's Complex nano-Fluids®."

99. In the press release, the Company also specifically reported on 2Q 2015 CnF sales volumes and revenues, stating that quarter's CnF sales were 76% greater than 1Q 2015 volumes and 34% above 2Q 2014 levels. The press release further stated that "CnF® volumes sold into U.S. markets were at a record high in the second quarter, soaring nearly 113% above first quarter levels and over 40% above year-ago volumes. For further comparison, CnF® domestic volumes in the second quarter were nearly 6.5% higher than fourth quarter, 2014 volumes which was the previous quarterly record for domestic CnF® sales."

100. With regard to CnF revenues for the quarter, the press release reported a 48% increase above 1Q 2015 levels. The press release credited the tremendous growth in CnF sales during 2Q 2015 to FracMax, stating:

> Flotek's aggressive promotion of the benefits of CnF® in completions and re-stimulation efforts by leveraging the quantitative evidence demonstrated through the patent pending FracMax™ analytical platform. These strategic sales and marketing

> efforts are ensuring that Flotek remains the leader in the customized chemistry solutions for the energy industry and is poised to take even greater advantage of any market recovery.

101. In the press release, Chisholm reiterated Flotek's strong quarter and credited FracMax, and its ability to validate the efficacy of CnF, based on public data, stating:

> "A return to profitability and significant growth in our energy chemistry business are the clear highlights in the quarter, which are the result of a number of key strategic initiatives executed adroitly by the Flotek team: the introduction and growth of FracMax™, Flotek's patent-pending data analytics technology that uses public data to validate the efficacy of Flotek's Complex nano-Fluid® suite of completion chemistries; the introduction of new, innovative CnF® chemistries that create even greater efficiencies for operators; and a new marketing and distribution strategy that provides exploration and production companies the opportunity to interact with and purchase Flotek's advanced chemistries directly from the Company."

102. On July 23, 2015, Flotek filed the press release with the SEC on Form 8-K, which was signed by defendant Schmitz.

103. On July 22, 2015, the Company also filed its Quarterly Report with the SEC on Form 10-Q for 2Q 2015. The Company's Form 10-Q was signed by defendants Chisholm and Schmitz, and reaffirmed the Company's statements announced that day. The Form 10-Q also contained required Sarbanes-Oxley certifications, signed by defendants Chisholm and Schmitz.

104. The Form 10-Q discussed FracMax, stating in part:

> The Company expects CnF® volumes to continue to outpace the overall industry activity level due to the distinctive advantage demonstrated by the patent pending FracMax™ analytical platform which provides quantitative validation of the improved well economics achieved by utilizing CnF® as part of well completions.
>
> * * *
>
> The patent pending ***FracMax™*** analytical platform is an innovative software technology that ***allows the Company to quantitatively demonstrate the benefits associated with the use of the Company's patented and proprietary Complex nano-Fluid® chemistries. The patent pending FracMax™ application has been integrated into the Company's sales and marketing process leading to new sales opportunities***.
>
> * * *
>
> The Company expects that competition for contracts and margins will remain intense but that product innovation, service improvements and data from its patent pending ***FracMax™ analytical platform should enable the Company to realize relative market share gains during the remainder of 2015 and into 2016***.

105. On July 23, 2015, defendants held an earnings conference call with investors. Defendants Chisholm and Schmitz actively participated in the conference call. During the call, defendants reiterated Flotek's 2Q 2015 financial results and emphasized FracMax's continuing role in the increasing number of validation projects in the Company's pipeline, increasing future sales of CnF and proving the efficacy of CnF to oil and gas operators and producers across North America. During the call, Chisholm stated:

> With dozens of validations in a pipeline and more joining the process every day, future growth is already in plain view. With the ***empirical data provided by FracMax, we believe the validation process will be accelerated, if not supplanted altogether by the wide-ranging acceptance of CnF across basins in North America***. That said, and as we said before, disruptive technology does not generally grow linearly. However, we know the TAM or total addressable market is multiples beyond our existing business which leaves ***plenty of opportunity for growth*** in nearly any market condition.

106. During the conference call, Chisholm gave guidance for 3Q 2015 revenue in the Energy Chemistry Technologies segment, the segment that accounted for CnF sales. During the call, Chisholm stated, "we are confident enough in our pipeline and ability to execute that we believe third quarter Energy Chemistry revenue will grow in excess of 10%, with steady to expanding margins in the same period."

107. Following Flotek's earnings conference call on July 23, 2015, analysts at Stephens raised their price targets for Flotek stock. The following day, Stephens published another report with positive commentary on Flotek, focusing on the growth opportunity during the market downturn and citing Flotek's impressive second quarter results "driven by its flagship CnF product." In the July 24, 2015 report, Stephens also increased its 2015 and 2016 adjusted earnings per share estimate for Flotek stating, "2Q's performance has positively changed our view on the industry's adoption rate of [CnF]."

108. On July 26, 2015, Oppenheimer & Co. Inc. ("Oppenheimer") also published positive commentary, reporting exceptionally strong second quarter results, noting that Flotek had reached an

apparent "tipping point" where it had "convinced operators of the efficacy and value of its CnF" completion chemistries. Oppenheimer stated that "Flotek delivered an impressive earnings beat in Q2 driven by a 76% increase in CnF sales sequentially." This remarkable 2Q 2015 success was credited to the FracMax analytical software.

109. Defendants' July 22 and 23, 2015 statements regarding CnF and FracMax were materially false and misleading when made. During the Class Period defendants knew, or recklessly disregarded, and failed to disclose, that:

(a) FracMax provided no support for the Company's claims that CnF was an effective product or provided economic value;

(b) Flotek was using false data in FracMax in its attempt to evidence the efficacy and economic benefits of its CnF products. During the Class Period, Flotek was adjusting the publicly reported data used in FracMax's software to falsely overstate the production impact of the Company's CnF products;

(c) Alternatively, defendants knew, or recklessly disregarded, that FracMax software had data inaccuracies and analytical processing errors that caused miscalculations of production data, thereby making it impossible to conclude that Flotek's CnF products were effective. During the Class Period, FracMax software did not have an accurate system for determining the correct number of wells attributable to a particular lease or unit, which caused inaccuracies in the FracMax database and caused the software to generate false data about CnF productivity in states like Texas where total production was reported by lease or unit;

(d) Flotek had no internal controls in place to ensure the integrity of the FracMax database. Defendants admitted that Flotek knowingly used unverified well count data from a third-party provider, Drillinginfo, in the FracMax database. At the end of the Class Period, Chisholm admitted the Company lacked sufficient internal controls, stating, "we should have had the quality control in place that could have validated [the Drillinginfo data] and it wasn't, and it is now."

Chisholm further added, "we should have cross-referenced [the Drillinginfo data] with the [Texas] Railroad Commission data and we didn't do that"; and

(e) As a result of (a)-(d) above, the Company's statements about its sales and revenue growth, validation projects, validation project pipeline and other business prospects were materially false and misleading and were made without any reasonable basis.

**3Q 2015 Earnings Release, SEC**
**Form 10-Q and Conference Call**

110. On October 21, 2015, the Company issued a press release announcing Flotek's 3Q 2015 financial results. The press release stated that the Energy Chemistry Technologies segment substantially outperformed overall industry activity due to the exceptional increases in CnF sales generated by FracMax. In the press release, the Company stated:

> The Energy Chemistry Technologies segment substantially outperformed the market activity indicators due to significant increases in CnF® sales volumes during the quarter. CnF® sales volumes increased 34% for the three months ended September 30, 2015, compared to the three months ended June 30, 2015, and increased 59% compared to the three months ended September 30, 2014. The increased sales of CnF® during the third quarter of 2015 were due to Flotek's continued aggressive promotion of the benefits of CnF® in completions and re-stimulation efforts by leveraging the quantitative evidence demonstrated through the FracMax® analytical platform. These strategic sales and marketing efforts are ensuring that Flotek remains a leader in the energy chemistry industry and is poised to take even greater advantage of any market recovery.

111. In the press release, Chisholm reiterated that CnF's increased market penetration was due to FracMax's ability to provide "uncontroverted empirical proof of the positive impact of CnF on well performance and economics" compared to wells that do not use CnF.

112. On October 23, 2015, Flotek filed the press release with the SEC on Form 8-K, which was signed by defendant Schmitz.

113. On October 21, 2015, the Company filed its Quarterly Report with the SEC on Form 10-Q for the 3Q 2015. The Company's Form 10-Q was signed by defendants Chisholm and

Schmitz, and reaffirmed the Company's statements announced that day. The Form 10-Q also contained required Sarbanes-Oxley certifications, signed by defendants Chisholm and Schmitz.

114. In the Form 10-Q, Flotek continued to praise FracMax and its ability to generate continued growth for the Company, stating:

> The Company expects CnF® sales to continue to outpace general oilfield activity as a result of the distinct benefits of CnF® in unconventional completions as demonstrated by the FracMax® analytical platform, which provides quantitative validation of the improved well economics achieved when CnF® is used in the well completion process.

115. In the Form 10-Q, Flotek also continued to provide a positive outlook for 2015 due in part to FracMax. In the Form 10-Q, Flotek again stated:

> The Company expects that competition for contracts and margins will remain intense but that product innovation, service improvements, and data from ***its FracMax® analytical platform should enable the Company to realize relative market share gains during the remainder of 2015 and into 2016***.

116. On October 22, 2015, defendants held an earnings conference call with investors. Defendants Chisholm and Schmitz actively participated in the conference call. During the call defendants reiterated Flotek's 3Q 2015 financial results.

117. Though revenue growth for 3Q 2015 had declined period-over-period, defendant Schmitz pointed out that sequential growth was positive due to FracMax. During the call, Schmitz stated:

> The decrease in year-over-year revenue was driven by the steep decline in oilfield activity. However, the increase in sequential revenue was driven almost entirely by increased sales of our Complex nano-Fluid completion chemistries, a direct result of the growing interest in our precision customized completion chemistries generated through the use of FracMax data and validation results.

118. During the call, Chisholm lauded FracMax's ability to prove the efficacy and economic benefits of CnF. In speaking about FracMax, defendant Chisholm stated:

> Not only does such a large database provide us compelling evidence of the impact of CnF on production, it also allows us to estimate the aggregate economic benefit of CnF usage for our clients. As we've noted in the past, data derived from FracMax suggests that the use of CnF has added billions in incremental economic

value to the over 250 operators who have chosen to use Flotek's advanced chemistries in their completion systems.

119. Defendant Chisholm also provided a positive outlook for 2016, stating:

> While growth has accelerated in recent months, largely a result of successful validations and support from empirical data provided by FracMax, we believe 2016 will provide even greater adoption velocity.

120. Analysts reacted positively following defendants' statements. Analysts at Oppenheimer issued a report on October 22, 2015, noting "unquestionably impressive" CnF sales for 3Q 2015 given oil prices and forecasted a 26% growth in revenues for Flotek's Energy Chemistry Technologies segment due to a continued growth in CnF sales driven by FracMax.

121. On October 23, 2015, Stephens also published positive commentary on Flotek's earnings, noting that "[f]ew companies in energy can boast the same growth profile as [Flotek] right now." It was clear that "broad based demand for CnF has grown," noting that there is potential for a "tripling of CnF sales from mid-2015 to exit rate 2017."

122. Defendants' October 21 and 22, 2015 statements regarding CnF and FracMax were materially false and misleading when made. During the Class Period, defendants knew, or recklessly disregarded, and failed to disclose, that:

(a) FracMax provided no support for the Company's claims that CnF was an effective product or provided economic value;

(b) Flotek was using false data in FracMax in its attempt to evidence the efficacy and economic benefits of its CnF products. During the Class Period, Flotek was adjusting the publicly reported data used in FracMax's software to falsely overstate the production impact of the Company's CnF products;

(c) Alternatively, defendants knew, or recklessly disregarded, that FracMax software had data inaccuracies and analytical processing errors that caused miscalculations of production data, thereby making it impossible to conclude that Flotek's CnF products were effective.

FracMax could not accurately determine the correct number of wells attributable to a particular lease or unit, which caused inaccuracies in FracMax's CnF versus non-CnF well comparisons;

(d) Flotek had no internal controls in place to ensure the integrity of the FracMax database. Defendants admitted that Flotek knowingly used unverified well count data from a third-party provider, Drillinginfo, in the FracMax database. At the end of the Class Period, Chisholm admitted the Company lacked sufficient internal controls, stating, "we should have had the quality control in place that could have validated [the Drillinginfo data] and it wasn't, and it is now." Chisholm further added, "we should have cross-referenced [the Drillinginfo data] with the [Texas] Railroad Commission data and we didn't do that"; and

(e) As a result of (a)-(d) above, the Company's statements about its sales and revenue growth, validation projects, validation project pipeline and other business prospects were materially false and misleading and were made without any reasonable basis.

**Statements Made During Analyst/Investor Conferences**

123. During the Class Period, defendants attended numerous analyst/investor conferences, during which they misled investors about FracMax, its ability to prove up the benefits of Flotek's CnF products, and the accuracy and reliability of FracMax's data. Defendant Chisholm spoke at each of the conferences and presented PowerPoint presentations that targeted FracMax and the benefits of Flotek's CnF products.

124. During each of these conferences, defendant Chisholm repeated in substance the following statements about FracMax and CnF:[3]

[3] Except as noted, these statements were made at the IPAA OGIS Florida Conference held on February 3, 2015, and repeated in substance at the following conferences: EnerCom's The Oil & Services Conference held on February 19, 2015; the IPAA Oil & Gas Symposium held on April 21, 2015; the GHS 100 Energy Conference held on June 24, 2015; EnerCom's Oil & Gas Conference held on August 19, 2015; the Barclays CEO Energy-Power Conference held on September 10, 2015; the Johnson Rice Energy Conference held on September 28, 2015; and the IPAA OGIS San Francisco Conference held on October 5, 2015.

- FracMax "has been key to accelerating interest in Flotek's innovative completion chemistries" (CnF products).

- "The concept and theory behind FracMax is fundamental, using publicly reported data from E&P companies themselves to verify the impact of CnF on production results by location. Very simply, using data from FracFocus and various state production databases, we take E&P companies' self-reported data and compare well production in the aggregate by basin from wells that use Flotek's CnF chemistry and those that don't."

- "[O]perators will ultimately find it hard to ignore data which conclusively validates the economic advantage of using CnF chemistry in completions."

- "FracMax has become the premier analytical tool in determining optimal completion methods."

- "Through data sourced from operator provided completion data, Flotek is able to compare production from both wells that use CnF technology and wells that do not."

- Speaking about FracMax, Chisholm stated: "Not only does such a large database give us compelling evidence of the impact of CnF on production, it also allows us to estimate the aggregate economic benefit of CnF usage for our clients."

- "Our ability to run virtually limitless production comparisons through our FracMax analytics subsidiary is not only helping our clients better understand the compelling benefit of using CnF chemistry in the completion process, but also assisting clients in developing a better understanding of completion best practices, validated through an analysis of data derived from the FracMax database."

- "[B]ased on data derived from FracMax, we estimate the use of Flotek's CnF completion chemistries has added at least $8 billion in aggregate value for operators when compared to those operators that have not adopted CnF chemistry."[4]

- "Based on the data derived from FracMax, we estimate the operators have lost revenue potential of $70 billion – yes, billion with a B – from not using CnF in their wells in just the Eagle Ford and Permian Basins alone."[5]

125. During these analyst/investor conferences, defendants also presented PowerPoint presentations which included information about FracMax. In a slide presented at each of the

[4] *See, e.g.*, the IPAA OGIS Florida Conference held on February 3, 2015; EnerCom's The Oil & Services Conference held on February 19, 2015; the IPAA Oil & Gas Symposium held on April 21, 2015; and the GHS 100 Energy Conference held on June 24, 2015.

[5] *See, e.g.*, the GHS 100 Energy Conference held on June 24, 2015; EnerCom's The Oil & Gas Conference held on August 19, 2015; the Barclays CEO Energy-Power Conference held on September 10, 2015; and the Johnson Rice Energy Conference held on September 28, 2015.

conferences, defendants assured investors that FracMax data was "sourced from operator-provided completion data from FracFocus and production data from government entities," and was "un-adjusted, providing for comparison and analysis of operators' self-reported data sets." The following slide presented this information:[6]




6 The slide was presented at the following conferences: the Cowan Group 4th Annual Ultimate Energy Conference held on December 3, 2014; the IPAA OGIS Florida Conference held on February 3, 2015; EnerCom's The Oil & Services Conference held on February 19, 2015; the IPAA Oil & Gas Symposium held on April 21, 2015; the GHS 100 Energy Conference held on June 24, 2015; EnerCom's The Oil & Gas Conference held on August 19, 2015; the Barclays CEO Energy-Power Conference held on September 10, 2015; the Flotek Analyst/Investor Day held on September 11, 2015; the Johnson Rice Energy Conference held on September 28, 2015; and the IPAA OGIS San Francisco Conference held on October 5, 2015.

126. During several of the analyst/investor conference calls where Flotek was promoting CnF and FracMax to investors, Chisholm credited FracMax for Flotek's resilience to declining oil prices during several industry and investor conferences, stating:

> While, like other companies with an energetic focus, we are not immune to the activity swings resulting from powerful commodity price cycles. Our energy chemistry business, for example, continues to grow, even as completion activity weakens. This anomalous and unprecedented growth is the result of continued market penetration and the power of FracMax, our proprietary data analysis and visualization software which shows, using producers' own empirical data, the compelling economic benefits of our customized chemistry.[7]

127. During the November 11, 2014 Stephens Investor Conference, Flotek, through its Senior Director of Corporate Finance and Strategy, Chris Edmonds, confirmed that FracMax used raw data, not data that was made up, tinkered with or tailored:

> ***[T]he data that comes from FracMax that matches – and remember, that's all public data that's reported by the E&P companies. It's their input list through FracFocus and it's their production data that's reported*** whether it's [ph] through (54:07) the Texas Railroad Commission (sic) [Railroad Commission of Texas] (54:07), the Oklahoma Oil and Gas Commission (sic) [Oklahoma Corporation Commission – Oil and Gas Division] (54:09), the Kansas Corporation Commission, whoever it is, ***that's just matching big data***.
>
> And that's not our data. ***Nobody can say we made that up or we tinkered or tailored, it is what it is, it's raw data***. And that will go a long way to proof positive that here's column x which is wells without CnF, here's column y, wells with CnF. And if the acknowledgers were looking for reasons to become disciples, that data certainly gives them a big public database to do so.

128. During the same call, defendant Chisholm stated that through FracMax "we now have ***accurate*** information to talk to people, to let them better understand the value that they're getting [from CnF]."

129. On February 2, 2015 and September 11, 2015, Flotek also held two analyst/investor day conferences specifically designed to provide investors and market analysts with information about FracMax and CnF.

---

7 These statements were made at the following conferences: the GHS 100 Energy Conference held on June 24, 2015; EnerCom's The Oil & Gas Conference held on August 19, 2015; the Barclays CEO Energy-Power Conference held on September 10, 2015; and the Johnson Rice Energy Conference held on September 28, 2015.

130. During the February conference, Chisholm walked investors through a live demonstration of the FracMax application, focusing on wells in Karnes County, Texas in the heart of the Eagle Ford basin. Chisholm started off by showing the initial month by month comparison of wells using CnF versus non-CnF wells, stating:

> With a CnF well, you'll make 5 barrels of oil per lateral foot, go back – you'll make 1.85 with a non-surfactant well or an old-style surfactant. You'll make 2 barrels of oil per lateral foot with what the clones are.

131. Chisholm's live FracMax presentation also displayed the cumulative production in Karnes County for the first 12 months of production, signifying $4 billion in lost revenue. Chisholm stated:

> And so at the end of the 12-month period, you're still making 2 barrels of oil per lateral foot [with CnF] versus right around 0.5 barrel of oil per lateral foot [without CnF]. And that's how you get to $4 billion [in lost revenue] in Karnes County.

132. During the February 2, 2015 analyst/investor day conference, defendants also presented the following PowerPoint slide to assure investors that FracMax "***accurately represents production data as reported by the well operator***," including data reported to the Texas Railroad Commission:




133. During the September 11, 2015 presentation, Chisholm walked investors through a slide-by-slide demonstration of the FracMax software.

134. At the September 11, 2015 conference, in a slide presentation, Chisholm compared four wells in Texas – one well that used CnF in its completion (Molnoskey 1H) and three nearby wells that did not (Targac 1H, Gillespie 1H and Berger Unit 1H) – to show how FracMax used public data from FracFocus and state reporting agencies to display well performance. All four wells used production data reported to the Texas Railroad Commission, which Chisholm assured investors was "back check[ed] and validate[d]." The following slides were shown at the September 11, 2015 investor conference:

## FracMax®

Back To Map

FracMax Analytics

Molnoskey 1H / Sabine Oil & Gas LLC
42-285-33756

Chem | SFV | ARI

prod: Oil
direction: Horizontal
lat: 29.54380
long: -97.10980
state: Texas
county: Lavaca
basin: Western Gulf
play(s): Eagle Ford, Austin Chalk
type: CnF
depth: 12,142

**Production**
Frac Date(s): 05-21-2014

| | (11 mo) 63,285 Bbl | (11 mo) 149,769 Mcf |
|---|---|---|
| 07-01-2014 | 12,594 | 25,935 |
| 08-01-2014 | 9,204 | 20,172 |
| 09-01-2014 | 6,922 | 16,486 |
| 10-01-2014 | 5,941 | 13,976 |
| 11-01-2014 | 5,041 | 14,305 |
| 12-01-2014 | 4,827 | 12,820 |
| 01-01-2015 | 4,136 | 12,306 |
| 02-01-2015 | 3,882 | 9,842 |
| 03-01-2015 | 4,109 | 9,204 |

**Chemicals**
Frac Date: 05-21-2014
Water: 6,312,012

| | | |
|---|---|---|
| | ingredients: Water | purpose: Other Ingredients |
| Proprietary | tradename: Other Ingredients<br>ingredients: Proprietary | supplier: Nabors Completion & Production Serv...<br>purpose: Other Ingredients |
| Proprietary | tradename: Other Ingredients<br>ingredients: Sodium Glycolate | supplier: Nabors Completion & Production Serv...<br>purpose: Other Ingredients |
| Proprietary | tradename: Other Ingredients<br>ingredients: Surfactant 2 | supplier: Nabors Completion & Production Serv...<br>purpose: Other Ingredients |
| Proprietary | tradename: Super GREEN SOLV-M<br>ingredients: Dodecane | supplier: Nabors Completion & Production Serv...<br>purpose: Paraffin & Scale Additives |
| Proprietary | tradename: Super GREEN SOLV-M<br>ingredients: Tridecane | supplier: Nabors Completion & Production Serv...<br>purpose: Paraffin & Scale Additives |
| Proprietary | tradename: XLBHT-3S<br>ingredients: Proprietary | supplier: Nabors Completion & Production Serv...<br>purpose: Cross-linkers |
| 68647-72-3 | tradename: Super Stim-120<br>ingredients: Citrus terpenes | supplier: Nabors Completion & Production Serv...<br>purpose: Surfactants & Foamers |
| 9000-30-0 | tradename: Other Ingredients<br>ingredients: Guar Gum | supplier: Nabors Completion & Production Serv...<br>purpose: Other Ingredients |
| Proprietary | | |

FLOTEK
Making a Difference. . .

# FracMax®

< Back To Map | FracMax Analytics

## Targac #1H / Sabine Oil & Gas LLC
42-285-33654

Chem | SFV | ARI

prod: Oil
direction: Horizontal
lat: 29.54603
long: -97.09964
state: Texas
county: Lavaca
basin: Western Gulf
play(s): Eagle Ford, Austin Chalk
type: w/o CnF
depth: 12,218

| Production<br>Frac Date(s): 10-21-2013 | (18 mo) 49,778<br>Bbl | (18 mo) 78,739<br>Mcf | Chemicals<br>Frac Date: 10-21-2013<br>Water: 11,315,724 | |
|---|---|---|---|---|
| 12-01-2013 | 8,886 | 8,699 | 7631-86-9<br>tradename: OB-2<br>ingredients: Sillica, crystalline quartz | supplier: Nabors Completion & Production Serv...<br>purpose: Gel Breakers |
| 01-01-2014 | 6,431 | 8,555 | 7647-14-5<br>tradename: pH-15L<br>ingredients: Sodium Chloride | supplier: Nabors Completion & Production Serv...<br>purpose: pH Control Additives |
| 02-01-2014 | 4,919 | 6,115 | 67-56-1<br>tradename: XLSTA-2<br>ingredients: Methyl alcohol | supplier: Nabors Completion & Production Serv...<br>purpose: Cross-linkers |
| 03-01-2014 | 4,552 | 5,935 | Proprietary<br>tradename: Other Ingredients<br>ingredients: Proprietary | supplier: Nabors Completion & Production Serv...<br>purpose: Other Ingredients |
| 04-01-2014 | 3,610 | 5,694 | Proprietary<br>tradename: Other Ingredients<br>ingredients: Proprietary | supplier: Nabors Completion & Production Serv...<br>purpose: Other Ingredients |
| 05-01-2014 | 2,902 | 4,692 | 112-30-1<br>tradename: Acid Inhibitor 3M (AI-3M)<br>ingredients: 1-DECANOL | supplier: Nabors Completion & Production Serv...<br>purpose: Acid Corrosion Inhibitors |
| 06-01-2014 | 2,382 | 4,967 | Proprietary<br>tradename: Super GREEN SOLV-M<br>ingredients: Aliphatic Hydrocarbons | supplier: Nabors Completion & Production Serv...<br>purpose: Paraffin & Scale Additives |
| 07-01-2014 | 2,209 | 4,619 | 7732-18-5<br>tradename: Other Ingredients<br>ingredients: Water | supplier: Nabors Completion & Production Serv...<br>purpose: Other Ingredients |
| 08-01-2014 | 2,071 | 3,868 | Proprietary<br>tradename: Super GREEN SOLV-M<br>ingredients: Undecane | supplier: Nabors Completion & Production Serv...<br>purpose: Paraffin & Scale Additives |

FLOTEK
Making a Difference. . .



1130645_1

# FracMax®

Back To Map

FracMax Analytics

## Gillespie 1H / Sabine Oil & Gas LLC

42-285-33673

Chem | SFV | ARI

prod: Oil
direction: Horizontal

lat: 29.52796
long: -97.10875

state: Texas
county: Lavaca

basin: Western Gulf
play(s): Eagle Ford, Austin Chalk

type: Clone
depth: 12,400

| Production<br>Frac Date(s): 04-14-2014 | (12 mo) 35,807<br>Bbl | (12 mo) 63,286<br>Mcf | Chemicals<br>Frac Date: 04-14-2014<br>Water: 8,354,262 | |
|---|---|---|---|---|
| 06-01-2014 | 5,820 | 9,439 | Proprietary<br>tradename: Other Ingredients<br>ingredients: Sodium Glycolate | supplier: Nabors Completion & Production Serv...<br>purpose: Other Ingredients |
| 07-01-2014 | 4,885 | 8,400 | Proprietary<br>tradename: Super GREEN SOLV-M<br>ingredients: Tridecane | supplier: Nabors Completion & Production Serv...<br>purpose: Paraffin & Scale Additives |
| 08-01-2014 | 3,859 | 6,631 | 14808-60-7<br>tradename: Other Ingredients<br>ingredients: Crystalline Silica (in the form of quartz) | supplier: Nabors Completion & Production Serv...<br>purpose: Other Ingredients |
| 09-01-2014 | 3,463 | 5,906 | 5131-66-8<br>tradename: Super Max II<br>ingredients: Propylene Glycol n-butyl ether | supplier: Nabors Completion & Production Serv...<br>purpose: Surfactants & Foamers |
| 10-01-2014 | 3,073 | 5,424 | 67-48-1<br>tradename: Other Ingredients<br>ingredients: ammonium, (2-Hydroxyethyl)trimethyl-, chloride | supplier: Nabors Completion & Production Serv...<br>purpose: Other Ingredients |
| 11-01-2014 | 2,677 | 5,090 | 111-76-2<br>tradename: Acid Inhibitor 3M (AI-3M)<br>ingredients: 2-butoxyethanol | supplier: Nabors Completion & Production Serv...<br>purpose: Acid Corrosion Inhibitors |
| 12-01-2014 | 2,453 | 4,207 | 7732-18-5<br>tradename: Water<br>ingredients: Water | supplier: Sabine Oil & Gas LLC<br>purpose: Water |
| 01-01-2015 | 2,140 | 4,063 | 9000-30-0<br>tradename: Other Ingredients<br>ingredients: Guar Gum | supplier: Nabors Completion & Production Serv...<br>purpose: Other Ingredients |
| 02-01-2015 | 1,799 | 3,478 | 25322-68-3<br>tradename: KR-153SL | supplier: Nabors Completion & Production Serv... |

FLOTEK
Making a Difference. . .




135. Chisholm then told investors that the CnF treated well (Molnoskey 1H) was 50% more productive compared to the non-CnF treated Targac 1H well, stating:

> Focus here on this: volumes 6 million gallons versus the original one of over 11 million; production 12,500 in the first month versus 8,000. So the production is up 50%. The fluid's down 50%. Here's complex nano-Fluid. In fact, it's super stim 120 – remember FDP? Super stim, in this case, they happen to put citrus terpene in there in terms of the benefit of what you can do with the Apple mapping technology that's embedded inside FracMax.

136. Chisholm also compared the CnF treated well to the untreated Berger 1H well, stating that the non-CnF treated well had less than half of the production of the Molnoskey 1H well:

> Wanted to show you well. Right next door to that CnF well is with – by Devon. For amount of fluid, 5.9 million, less than half the production, right next door to the well that had CnF in it with a similar amount of fluid in the frac job. This type of data analysis, absolutely no way Flotek had access to it until we invented FracMax. Absolutely no one else in the industry has it.



1130645_1

137. During the September 11, 2015 investor conference, defendant Chisholm defended the reliability of FracMax data, stating:

> It was reported 3 or 4 weeks ago in a comment that we claim performance of CnF, that's not right. We report the performance, and there's a big difference. ***We don't create the data***, we allow visualization of the data in a way that people have never seen before.

138. During the September 11, 2015 conference, defendants also played a video that detailed FracMax's capabilities, concluding that FracMax was "revolutionizing an industry" and that "[y]ou can touch it, you can see it, and ***now you can believe it***."

139. During the same conference, in a video presentation, Flotek announced that FracMax was currently available to customers, stating "[n]ow U.S. and national oil companies can license a version of the application customized to them on FracMax centric Apple iPad."

140. Defendants' statements regarding CnF and FracMax made during Class Period analyst/investor conferences discussed in ¶¶124-139, were materially false and misleading when made. During the Class Period defendants knew, or recklessly disregarded, and failed to disclose, that:

(a) FracMax provided no support for the Company's claims that CnF was an effective product or provided economic value;

(b) Flotek was using false data in FracMax in its attempt to evidence the efficacy and economic benefits of its CnF products. During the Class Period, Flotek was adjusting the publicly reported data used in FracMax's software to falsely overstate the production impact of the Company's CnF products;

(c) Alternatively, defendants knew, or recklessly disregarded, that FracMax software had data inaccuracies and analytical processing errors that caused miscalculations of production data, thereby making it impossible to conclude that Flotek's CnF products were effective. During the Class Period, FracMax software did not have an accurate system for determining the

correct number of wells attributable to a particular lease or unit, which caused inaccuracies in the FracMax database and caused the software to generate false data about CnF productivity in states like Texas where total production was reported by lease or unit;

(d) Flotek had no internal controls in place to ensure the integrity of the FracMax database. Defendants admitted that Flotek knowingly used unverified well count data from a third-party provider, Drillinginfo, in the FracMax database. At the end of the Class Period, Chisholm admitted the Company lacked sufficient internal controls, stating, "we should have had the quality control in place that could have validated [the Drillinginfo data] and it wasn't, and it is now." Chisholm further added, "we should have cross-referenced [the Drillinginfo data] with the [Texas] Railroad Commission data and we didn't do that"; and

(e) As a result of (a)-(d) above, the Company's statements about its sales and revenue growth, validation projects, validation project pipeline and other business prospects were materially false and misleading and were made without any reasonable basis.

## THE TRUTH EMERGES

**Bronte Capital's November 9, 2015 Report**

141. The truth about FracMax and CnF began to emerge on November 9, 2015 when Bronte Capital published an online report that accused Flotek of presenting false information to investors at Flotek's September 11, 2015 investor conference, raising serious concerns about the accuracy of FracMax software and the efficacy of CnF. The report, titled "Flotek: a plea for accuracy," began by stating:

> Warning: this is a really gonzo story. We tried to check the data and use the main marketing tool for a billion dollar company.
>
> None of it worked out. The data looks like it was made up or at least systematically rigged. The marketing tool (an iPad app) simply crashes and is non-functional.
>
> We can't tell whether the whole company is this suspect – but this is as non-sensical as anything we have seen on Wall Street. The closest comparable on

this blog was Universal Travel Group, a stock which is now delisted and where the principals settled civil fraud charges.

If you own the stock you must work this to the end. Try to reproduce our results. If this is the whole story this stock will trade with a low single digit handle or lower.

142. The Bronte Capital Report uncovered that FracMax production data for three non-CnF wells located in the Texas Eagle Ford shale, presented during the September 11, 2015 investor day conference, appeared to be manipulated by Flotek, making CnF appear more effective than it actually was. Specifically, the Report published data showing that FracMax's well production data for the three non-CnF wells did not match the data reported to the Texas Railroad Commission, as Flotek claimed. The Report alleged a pattern which showed that Flotek had reduced the production data for the non-CnF wells by 40% to 50% less, while leaving the production data for the CnF well unchanged. The Report contained the following tables, to demonstrate that the well production data was adjusted.[8]

**Berger 1H:**

| | Oil (Bbl) | | | Gas (Mcf) | | |
|---|---|---|---|---|---|---|
| Month | FTK - FracMax | Texas RRC | % of RRC | FTK - FracMax | Texas RRC | % of RRC |
| Sep-14 | | 8,547 | | | 15,046 | |
| Oct-14 | | 12,817 | | | 16,140 | |
| Nov-14 | 5,022 | 8,370 | 60.0% | 3,936 | 7,872 | 50.0% |
| Dec-14 | 3,743 | 6,238 | 60.0% | 5,002 | 10,004 | 50.0% |
| Jan-15 | 2,946 | 4,910 | 60.0% | 4,880 | 9,759 | 50.0% |
| Feb-15 | - | - | | 10,036 | 20,071 | 50.0% |
| Mar-15 | 1,997 | 3,328 | 60.0% | 6,103 | 12,205 | 50.0% |
| Apr-15 | 2,371 | 3,952 | 60.0% | 6,605 | 13,210 | 50.0% |
| May-15 | 567 | 945 | 60.0% | 899 | 1,798 | 50.0% |
| Jun-15 | | 5,878 | | | 9,209 | |
| Jul-15 | | 3,182 | | | 9,465 | |
| Aug-15 | | 3,500 | | | 7,189 | |

8 The tables are read as follows: each table shows the production comparison for both oil and gas. The heading labeled "FTK-FracMax" are the numbers as shown by Flotek during the September 11, 2015 investor conference. *See* ¶134. The column labelled "Texas RRC" shows the publicly reported production data Bronte Capital obtained from the Texas Railroad Commission website. The column labeled "% of RRC" divides the "FTK-FracMax" number into the "Texas RRC" number, representing the understated production for the non-CnF wells (Berger, Gillespie and Targac) and the non-changed production for the CnF well (Molnoskey).

**Gillespie 1H:**

| Month | Oil (Bbl) FTK - FracMax | Oil (Bbl) Texas RRC | Oil (Bbl) % of RRC | Gas (Mcf) FTK - FracMax | Gas (Mcf) Texas RRC | Gas (Mcf) % of RRC |
|---|---|---|---|---|---|---|
| May-14 | | 13,417 | | | 24,099 | |
| Jun-14 | 5,820 | 9,700 | 60.0% | 9,439 | 18,877 | 50.0% |
| Jul-14 | 4,885 | 8,142 | 60.0% | 8,400 | 16,800 | 50.0% |
| Aug-14 | 3,859 | 6,431 | 60.0% | 6,631 | 13,261 | 50.0% |
| Sep-14 | 3,463 | 5,772 | 60.0% | 5,906 | 11,811 | 50.0% |
| Oct-14 | 3,073 | 5,121 | 60.0% | 5,424 | 10,848 | 50.0% |
| Nov-14 | 2,677 | 4,462 | 60.0% | 5,090 | 10,179 | 50.0% |
| Dec-14 | 2,453 | 4,089 | 60.0% | 4,207 | 8,413 | 50.0% |
| Jan-15 | 2,140 | 3,566 | 60.0% | 4,063 | 8,125 | 50.0% |
| Feb-15 | 1,799 | 2,999 | 60.0% | 3,478 | 6,955 | 50.0% |
| Mar-15 | | 3,597 | | | 7,932 | |
| Apr-15 | | 2,983 | | | 7,039 | |
| May-15 | | 2,817 | | | 6,324 | |
| Jun-15 | | 2,516 | | | 6,485 | |
| Jul-15 | | 2,382 | | | 6,424 | |
| Aug-15 | | 2,197 | | | 6,052 | |

**Molnoskey 1H:**

| Month | Oil (Bbl) FTK - FracMax | Oil (Bbl) Texas RRC | Oil (Bbl) % of RRC | Gas (Mcf) FTK - FracMax | Gas (Mcf) Texas RRC | Gas (Mcf) % of RRC |
|---|---|---|---|---|---|---|
| Jun-14 | | 18,436 | | | 35,398 | |
| Jul-14 | 12,594 | 12,594 | 100.0% | 25,935 | 25,935 | 100.0% |
| Aug-14 | 9,204 | 9,204 | 100.0% | 20,172 | 20,172 | 100.0% |
| Sep-14 | 6,922 | 6,922 | 100.0% | 16,486 | 16,486 | 100.0% |
| Oct-14 | 5,941 | 5,941 | 100.0% | 13,976 | 13,976 | 100.0% |
| Nov-14 | 5,041 | 5,041 | 100.0% | 14,305 | 14,305 | 100.0% |
| Dec-14 | 4,827 | 4,827 | 100.0% | 12,820 | 12,820 | 100.0% |
| Jan-15 | 4,136 | 4,136 | 100.0% | 12,306 | 12,306 | 100.0% |
| Feb-15 | 3,882 | 3,882 | 100.0% | 9,842 | 9,842 | 100.0% |
| Mar-15 | 4,109 | 4,109 | 100.0% | 9,204 | 9,204 | 100.0% |
| Apr-15 | | 3,407 | | | 7,420 | |
| May-15 | | 3,222 | | | 7,303 | |
| Jun-15 | | 2,881 | | | 6,760 | |
| Jul-15 | | 2,330 | | | 5,993 | |
| Aug-15 | | 2,180 | | | 5,041 | |

**Targac 1H:**

| Month | Oil (Bbl) FTK - FracMax | Oil (Bbl) Texas RRC | Oil (Bbl) % of RRC | Gas (Mcf) FTK - FracMax | Gas (Mcf) Texas RRC | Gas (Mcf) % of RRC |
|---|---|---|---|---|---|---|
| Nov-13 | | 17,761 | | | 21,583 | |
| Dec-13 | 8,886 | 14,810 | 60.0% | 8,699 | 17,397 | 50.0% |
| Jan-14 | 6,431 | 10,719 | 60.0% | 8,555 | 17,110 | 50.0% |
| Feb-14 | 4,919 | 8,198 | 60.0% | 6,115 | 12,230 | 50.0% |
| Mar-14 | 4,552 | 7,586 | 60.0% | 5,935 | 11,869 | 50.0% |
| Apr-14 | 3,610 | 6,016 | 60.0% | 5,694 | 11,387 | 50.0% |
| May-14 | 2,902 | 4,836 | 60.0% | 4,692 | 9,383 | 50.0% |
| Jun-14 | 2,382 | 3,970 | 60.0% | 4,967 | 9,933 | 50.0% |
| Jul-14 | 2,209 | 3,681 | 60.0% | 4,619 | 9,238 | 50.0% |
| Aug-14 | 2,071 | 3,451 | 60.0% | 3,868 | 7,735 | 50.0% |
| Sep-14 | | 2,977 | | | 7,306 | |
| Oct-14 | | 2,678 | | | 7,411 | |
| Nov-14 | | 2,195 | | | 6,934 | |
| Dec-14 | | 2,092 | | | 7,206 | |
| Jan-15 | | 1,950 | | | 4,983 | |
| Feb-15 | | 2,058 | | | 4,702 | |
| Mar-15 | | 2,501 | | | 5,008 | |
| Apr-15 | | 1,719 | | | 3,969 | |
| May-15 | | 1,524 | | | 3,668 | |
| Jun-15 | | 1,369 | | | 3,846 | |
| Jul-15 | | 1,293 | | | 4,529 | |
| Aug-15 | | 1,165 | | | 4,208 | |

143. The Bronte Report summed up the false data, stating:

> Not only were Flotek and Chisholm's repeated insistences that the data is "as reported by the operator" incorrect, but the adjustments we have seen ARE consistently favorable to [Flotek's] CnF well and detrimental to the non-CnF wells.
>
> Mistakes happen, though they undermine the many declarations of FracMax's statistical robustness.
>
> Given this pattern, of adjustments we can't help but wonder if these divergences are, in fact, mere mistakes. It is just too suspicious to consistently understate the results from the wells that did not use their product.

144. The Report also raised questions about the efficacy of Flotek's CnF products. The Report stated: "Comparing the adjusted and unadjusted data for Molnoskey (CnF) and Targac (no CnF) reveals a starker problem: for at least some months, when the oil production is reported without Flotek's alterations, the CnF-containing well performed worse, not better."

145. In summing up its research, the Report stated, "we point out that on John Chisholm's data (after taking out the errors) it is impossible to conclude that Flotek's complex nano-fluids do anything."

146. On this news, shares of Flotek declined $3.50 per share, over 19%, to close on November 9, 2015 at $14.60 per share, on heavy volume.

**Defendants' Response to the Bronte Capital Report**

147. On November 9, 2015, Flotek immediately denied the allegations in the Bronte Capital Report. The following morning, on November 10, 2015, the Company issued a press release at 8:00 a.m. and changed its position, admitting the Bronte Capital Report was correct. Flotek had understated the production of the non-CnF well, making the CnF well look more productive than it actually was.

148. The press release also contained the Company's contrived excuses for the false data, analytical processing errors in the FracMax software and purportedly erroneous data from a third-party provider, Drillinginfo. Defendants claimed that data provided by Drillinginfo caused FracMax to identify the three non-CnF wells as contained in units with multiple wells (as opposed to single well units), which required FracMax to incorrectly apply an allocation algorithm to the production for the non-CnF wells.

149. On November 10, 2015, defendants also spoke at a Stephen's Investor Conference and gave more detail on their story. During the conference, Chisholm admitted that the Company's internal controls "did not catch" the FracMax purported error. In response to analysts' questions, Chisholm admitted that the Company had no internal controls in place to check the accuracy of the third-party data from Drillinginfo. As Chisholm admitted, "we should have had the quality control in place that could have validated [the Drillinginfo data] and it wasn't, and it is now." Chisholm

further added, "we should have cross-referenced [the Drillinginfo data] with the [Texas] Railroad Commission data and we didn't do that."

150. During the conference, defendants acknowledged that the Company had appointed an independent committee to ensure "process precision and data accuracy in FracMax."

151. During the conference call, Chisholm also admitted that Flotek knew about the analytical processing errors in the FracMax software during the Class Period. Chisholm disclosed that during the Class Period, the Company knew that the FracMax allocation algorithm used in Texas was problematic and that changes were being made. During the call, Chisholm stated:

> And I think what we wanted to, for sure, convey to all of you today is that ***we recognize that through the algorithm allocation that's unique in Texas, the software made a mistake***.
>
> ***We had, several months ago, evolved to a different allocation program*** that speaks to – in the State of Texas, every well does a yearly well test, and you create an algorithm off of that. ***And that has been a 60-day to 90-day work in progress that's now been concluded that we feel the algorithm will be very accurate in terms of relying on whether that's the proper amount of wells that are attributed to a particular lease***. It's identified through the State of Texas through the API number and the well testing.
>
> And we're very confident that with this independent group, with whoever they ultimately select, provides the best validation; that they're going to conclude that the FracMax data is accurate, because it is public data; and ***the algorithms*** that we use to put it together, especially ***that have been calibrated differently regarding the allocation program, will be as good as they've seen***.

152. Even though the number of wells potentially affected by the allocation algorithm was far greater than the three wells identified in the Bronte Capital Report, the Company declined to share evidence showing otherwise. As noted by Chisholm at the conference:

> And I think to give some context here, there's all ***– in the State of Texas, and I think we've got now probably close to 30,000 wells in the FracMax database***, there's all kinds of wells where the CnF well has been allocated and not shows a 100%. I think part of the message in the report yesterday was that the software targeted non-CnF wells and would allocate those and wouldn't target CnF wells and would treat them differently, but we didn't think it was purposeful today to show you a whole run of CnF wells that have been allocated 60% based or 40% or even 30%, if there's three CnF wells that are on the lease. And the same thing is true that there's non-CnF wells on a single lease that have a 100%, because that's the only well on the lease. And ***we have all that data, we just didn't feel it made sense to show it today*** . . . .

153. Following the Company's November 10, 2015 announcement, shares of Flotek plummeted another 38%, or $5.56 per share, closing at $9.04 per share, on heavy volume.

**Market Analyst Responses**

154. Following defendants' November 10, 2015 announcements, analysts rejected Flotek's attempt to lay blame on Drillinginfo for the false data in FracMax. In a November 10, 2015 research report issued by Iberia Capital Partners ("Iberia"), the report stated that the four wells presented at the September 11, 2015 investor conference were designated by Drillinginfo as being single well leases, not multiple leases, therefore the Texas Railroad Commission data for those wells did not require adjustment.

155. On November 10, 2015, analysts also commented on the impact the revelations concerning FracMax and CnF would have on Flotek going forward. In a report dated November 11, 2015, Oppenheimer stated: "We believe uncertainty about the accuracy of FracMax data and effectiveness of CnF will serve to deter some first-time buyers from using CnF and hurt top-line growth." As a result of the announcements, Oppenheimer lowered revenue estimates for Flotek's Energy Chemistry Technologies segment from $63.2 million for 4Q 2015 and $226.5 million for FY 2015 to $57.8 million for 4Q 2015 and $221.1 million for FY 2015.

156. Likewise, in Iberia's November 10, 2015 report, analysts also reported that given the revelation of inaccurate data, "we believe [Flotek] faces significant challenges in achieving market penetration," and "[a]s a result, we believe growth expectations for CnF sales should be moderated as the industry grapples with the changing story, potentially risking relationships with the client base."

157. Several analyst firms following Flotek also lowered their price targets for the Company's stock following the disclosures, as demonstrated in the following chart:

| Firm | Prior Target Price | Target Price Following Disclosures |
|---|---|---|
| Stephens | $26.00 | $20.00 |
| Coker & Palmer | $21.00 | $9.00 |
| Iberia | $14.00 | $5.00 |
| Seaport Global Securities | $21.00 | $11.00 |
| Oppenheimer | $16.00 | Removed target price |

158. In its November 10, 2015 report, market analyst Oppenheimer also expressed concern that because of FracMax credibility issues and concerns about the effectiveness of CnF, the Company's CnF products would face increased downward pricing pressure as customers subjected the Company to greater scrutiny:

> While results in Q2 easily surpassed our expectations, questions surrounding the accuracy of FracMax data could deter CnF adoption among new users and negatively affect pricing. We believe the company could benefit from disclosing all of its well performance data that is in the record, to remove any concerns about the ability of CnF use to positively impact well performance.

159. Analysts also commented on Flotek customers' reaction to the news that FracMax data was inaccurate. In a November 10, 2015 online post by OilPro titled "O&G's Volkswagen Moment? Oil Service Firm Accused of Fudging Data," the author stated: "Industry contacts tell us that several clients have begun reevaluating their use of the product in question, although Flotek said Tuesday that no customers have placed stops on their orders." Similarly, the November 9, 2015 report issued by Iberia noted that the problems uncovered by the Bronte Capital Report "confirm[] what we have heard from the field, from both clients and CnF competitors, for months now, that the effectiveness of CnF is potentially not quite as dramatic as has been marketed."

**Flotek's January 19, 2016 Announcements**

160. Flotek's stock price continued to decline after the Class Period as a result of defendants' fraud. On January 19, 2016, defendants announced: (i) that the SEC had opened an inquiry related to the FracMax issue; (ii) the retention of a consultant to review the FracMax

software and efficacy of CnF; and (iii) the formation of a special committee of independent directors to direct the review of both issues. On this news, Flotek shares declined 25% on January 19, 2016, on a volume of over five million shares.

## CLASS ACTION ALLEGATIONS

161. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased Flotek common stock during the Class Period (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

162. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Flotek common stock was actively traded on the NYSE. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Millions of Flotek shares were traded publicly during the Class Period on the NYSE. As of October 15, 2015, Flotek had 53,627,361 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Flotek or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

163. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

164. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

165. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations and prospects of Flotek;

(c) whether the price of Flotek common stock was artificially inflated during the Class Period; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

166. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION AND ECONOMIC LOSS TO CLASS MEMBERS

167. During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market through a course of conduct that artificially inflated the price of Flotek common stock throughout the Class Period. Defendants did this by issuing materially false and misleading statements regarding the reliability and accuracy of FracMax software, the efficacy of Flotek's CnF products, market penetration for and sales of its CnF products, the Company's validation projects and validation project pipeline and future revenue growth. When defendants' prior misrepresentations and omissions were revealed, Flotek's stock price fell precipitously as the prior

artificial inflation came out of the stock. As a result of their purchases of Flotek common stock, during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

168. Defendants' false and misleading statements, as alleged herein, had their intended effect and caused Flotek's common stock to trade at artificially inflated levels throughout the Class Period, reaching a Class Period high of $23.68 per share on October 23, 2014.

169. As a direct result of disclosures on November 9 and 10, 2015, Flotek's stock price suffered significant declines. Flotek's stock price also suffered a significant decline on January 19, 2016, following the end of the Class Period, when additional information was revealed regarding FracMax and Flotek's CnF.

170. On November 9, 2015, when Bronte Capital published its Report calling into question the accuracy of FracMax data and efficacy of Flotek's CnF products and accused the Company of "systematically rigg[ing]" data, Flotek's stock price dropped $3.50 per share, or over 19%, on volume of close to 16 million shares. *See* ¶¶141-146. The next day, on November 10, 2015, before the market opened, when the Company further disclosed that FracMax data was in fact false and that the Company had understated production for non-CnF wells, making CnF look more productive than it actually was, and blaming purported analytical processing errors and erroneous data for the false data, Flotek's stock price dropped and additional $5.56 per share, or over 38%, on volume of over 22 million shares. *See* ¶¶147-153. Two months later, following the end of the Class Period, when the Company disclosed: (i) that the SEC had opened an inquiry related to the FracMax issue; (ii) the retention of a consultant to review the FracMax software and efficacy of CnF; and (iii) the formation of a special committee of independent directors to direct the review of both issues, Flotek shares declined $1.81 per share, or 25%, on a volume of over five million shares. *See* ¶160.

171. These price declines removed the artificial inflation from Flotek's stock price, causing real economic loss to investors who had purchased the stock during the Class Period.

**Analysts' Response to The Disclosures**

172. Analysts' reports following these disclosures conveyed surprise and concern over Flotek's use of false data to evidence the efficacy of its CnF products, and discussed the negative implications the disclosures would have for Flotek going forward.

173. In a November 10, 2015 report issued by Iberia, analysts reported that given the revelation of inaccurate data "we believe [Flotek] faces significant challenges in achieving market penetration," and "[a]s a result, we believe growth expectations for CnF sales should be moderated as the industry grapples with the changing story, potentially risking relationships with the client base."

174. In a report dated November 11, 2015, Oppenheimer stated: "We believe uncertainty about the accuracy of FracMax data and effectiveness of CnF will serve to deter some first-time buyers from using CnF and hurt top-line growth." As a result of the announcements, Oppenheimer lowered revenue estimates for Flotek's Energy Chemistry Technologies segment from $63.2 million for 4Q 2015, and $226.5 million for FY 2015, to $57.8 million for 4Q 2015, and $221.1 million for FY 2015.

175. Several analyst firms following Flotek also lowered their price targets for the Company's stock following the disclosures, demonstrating their belief that CnF sales would be dramatically impacted by the news:

| Firm | Prior Target Price | Target Price Following Disclosures |
|---|---|---|
| Stephens | $26.00 | $20.00 |
| Coker & Palmer | $21.00 | $9.00 |
| Iberia | $14.00 | $5.00 |
| Seaport Global Securities | $21.00 | $11.00 |

| Firm | Prior Target Price | Target Price Following Disclosures |
|---|---|---|
| Oppenheimer | $16.00 | Removed target price |

176. The declines in Flotek's stock price, as discussed above, were a direct result of the nature and extent of defendants' prior false statements and omissions being revealed to investors and the market. The timing and magnitude of Flotek's stock price declines negate any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by plaintiff and other members of the Class, was a direct result of defendants' misstatements and omissions which artificially inflated Flotek's stock price and maintained the price at artificially inflated levels, and the subsequent significant decline in the value of Flotek common stock when defendants' prior misrepresentations and omissions were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

177. Plaintiff and the Class are entitled to presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972) because the claims asserted herein against defendants are predicated upon omissions of material fact for which there was a duty to disclose.

178. Plaintiff and the Class are also entitled to a presumption of reliance under the fraud-on-the-market doctrine because the market for Flotek common stock was an efficient market at all relevant times by virtue of the following factors, among others:

(a) Flotek stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Flotek filed periodic public reports with the SEC and/or the NYSE;

(c) Flotek regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Flotek was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

179. As a result of the foregoing, the market for Flotek common stock promptly incorporated current information regarding Flotek from publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all those who transacted in Flotek common stock during the Class Period suffered similar injury through their transactions in Flotek common stock at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

180. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge

that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Flotek who knew that the statement was false when made.

**COUNT I**
**Violation of §10(b) of the Exchange Act**
**and Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

181. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

182. During the Class Period, defendants carried out a plan, scheme and course of conduct, which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; and (ii) caused plaintiff and other members of the Class to purchase Flotek common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

183. Defendants: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Flotek common stock in an effort to maintain artificially high market prices for Flotek common stock in violation of §10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

184. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about Flotek's financial well-being and prospects, as specified herein.

185. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices and a course of conduct, as alleged herein, in an effort to assure investors of Flotek's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Flotek and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Flotek common stock during the Class Period.

186. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public, which they knew, and/or recklessly disregarded, was materially false and misleading.

187. The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them, including, among other things, that certain of the Company's subsidiaries or business units were engaged in improper business practices and misrepresented the financial results, performance, and value of the Company's business units and equity investments. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Flotek's financial well-being and prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being and prospects throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

188. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Flotek common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of Flotek common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the stock trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Flotek common stock during the Class Period at artificially high prices and were damaged thereby.

189. At the time of said misrepresentations and/or omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other

members of the Class and the marketplace known the truth regarding the problems that Flotek was experiencing, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their Flotek common stock, or, if they had acquired such stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

190. By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

191. As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of Flotek common stock during the Class Period.

**COUNT II**
**Violation of §20(a) of the Exchange Act**
**Against the Individual Defendants**

192. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

193. The Individual Defendants acted as controlling persons of Flotek within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be

misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

194. In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

As set forth above, Flotek and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of Flotek common stock during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, certifying plaintiff as Class Representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Class Counsel;

B. Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED: March 28, 2016

ROBBINS GELLER RUDMAN
& DOWD LLP
LAURIE L. LARGENT

s/ LAURIE L. LARGENT
LAURIE L. LARGENT

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiff

SPONSEL MILLER GREENBERG PLLC
ROGER B. GREENBERG
Federal ID No. 3932
Texas State Bar No. 08390000
50 Briar Hollow Lane, Suite 370 West
Houston, Texas 77027
Telephone: 713/892-5400
713/892-5401 (fax)
roger@smglawgroup.com

Liaison Counsel

CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2016, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 28, 2016.

s/ LAURIE L. LARGENT
LAURIE L. LARGENT

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: llargent@rgrdlaw.com

# Mailing Information for a Case 4:15-cv-03327 Ho v. Flotek Industries, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Thomas Robert Ajamie**
  tajamie@ajamie.com,dmolloy@ajamie.com
- **Thomas E Bilek**
  tbilek@bileklaw.com,lmank@bileklaw.com
- **Willie C Briscoe**
  wbriscoe@thebriscoelawfirm.com,brittney@powerstaylor.com
- **Sammy Ford , IV**
  sford@abrahamwatkins.com,gblack@abrahamwatkins.com
- **Roger B Greenberg**
  roger@smglawgroup.com,sam@smglawgroup.com
- **Joe Kendall**
  jkendall@kendalllawgroup.com,jmckey@kendalllawgroup.com,administrator@kendalllawgroup.com
- **Phillip Kim**
  pkim@rosenlegal.com
- **Laurie L. Largent**
  LLargent@rgrdlaw.com
- **Keith Robert Lorenze**
  klorenze@rosenlegal.com
- **Jamie J McKey**
  jmckey@kendalllawgroup.com,administrator@kendalllawgroup.com
- **Danielle S Myers**
  dmyers@rgrdlaw.com,spatel@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **Gerard G Pecht**
  gpecht@fulbright.com,tlowe@fulbright.com
- **Peter Andrew Stokes**
  pstokes@fulbright.com
- **Harry Paul Susman**
  hsusman@susmangodfrey.com,ecf-5237371b17db@ecf.pacerpro.com,ecf-b60c3f9650b8@ecf.pacerpro.com,jmccrary@susmangodfrey.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)