United States District Court
Southern District of Texas
**ENTERED**
March 30, 2017
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CALEB HO, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 4:15-CV-3327 |
| | § | |
| FLOTEK INDUSTRIES, INC., *et al*, | § | |
| | § | |
| Defendants. | § | |

## ORDER

Before the Court is Defendants' Motion to Dismiss (Doc. #47), Plaintiffs' Response (Doc. #48), Defendants' Reply (Doc. #51), Defendants' Notice of Supplemental Authority in Support of Defendants' Motion to Dismiss (Doc. #53), Plaintiffs' Response to Defendants' Notice of Supplemental Authority (Doc. #54), and Defendants' Reply to Plaintiffs' Response (Doc. #55). The Court also heard oral argument regarding the Motion to Dismiss on Febuary 10, 2017. Having considered the arguments and the applicable law, the Court grants Defendants' Motion to Dismiss.

### I. Background

As alleged, this case is a securities class action on behalf of purchasers of Flotek common stock between October 23, 2014 and November 9, 2015, against Flotek Industries, Inc. ("Flotek"), its President and Chief Executive Officer ("CEO") John W. Chisholm ("Chisholm"), and its Chief Financial Officers ("CFO") Robert M. Schmitz ("Schmitz") and H. Richard Walton ("Walton"), for violating § 10(b) and § 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder. Doc. #42, ¶1. Plaintiffs pled the following facts to support their claim. As required, this Court accepts all well pleaded facts as

true.

Flotek is a public company that develops and markets environmentally-friendly chemistries designed to maximize production in oil and gas wells. Doc. #42, ¶2. Flotek's "hallmark" product line is its patented customized chemistries known as Complex nano-Fluid ("CnF") technologies. CnFs are additives that purportedly increase the recovery and flow of hydrocarbons of wells, therefore, increasing well profitability. Doc. #42, ¶¶2-3. In order to substantiate the usefulness of CnFs (i.e. provide evidence to consumers that CnFs increased well profitability), Flotek developed a software application called FracMax—a proprietary software application for the specific purpose of marketing and selling CnF products. Doc. #42, ¶30. Flotek introduced FracMax to investors at a June 14, 2014 investor's day conference. Doc. #42, ¶2-3.

Defendants explained to investors that FracMax used production data that exploration and production companies ("E&P companies") self-reported to state agencies, like the Texas Railroad Commission ("TRC"), to prove the impact of CnFs on oil and gas production. Doc. #42, ¶¶38, 124. Defendants maintained throughout the alleged class period that FracMax data "accurately represents production data as reported by the well operator" and is "unadjusted." Doc. #42, ¶¶125, 132. Defendants further maintained that FracMax's data was "not [Flotek's] data . . . [n]obody can say [Flotek] made [the data] up or . . . tinkered or tailored [it] . . . it is raw data." Doc. #42, ¶127. In fact, Flotek's CEO described how FracMax works in the following way: "[v]ery simply, using data from FracFocus[1] and various state production databases, we take E&P companies' self-reported data and compare well production in the aggregate, by basin, from

[1] FracFocus is a chemical disclosure registry that provides public data on wells that use hydraulic fracturing chemicals like CnF. See https:FracFocus.org/welcome.

wells that use Flotek's CnF chemistry and those that [do not]." Doc. #42, ¶¶36, 124. Accordingly, FracMax's ability to use E&P companies' self-reported production data to perform side-by-side comparisons of wells that used CnF with wells that did not use CnF was one of FracMax's key features, and the main feature that demonstrated CnF's efficacy.

From June 2014 to November 2015, Defendants advertised FracMax as an integral component of Flotek's sales strategy and key to "materially broaden[ing] the reach of Flotek's marketing efforts" for its CnF products, as well as "fueling" its sales. Doc. #42, ¶¶5, 33, 81. During this period, Flotek's CEO, one of FracMax's inventors, touted FracMax as "the most compelling sales and value validation tool I have experienced in my three decades in this industry." Doc. #42, ¶39. Defendants also told investors that the FracMax software could "conclusively" validate the benefits of Flotek's CnF products, including their effectiveness and ability to create millions of dollars in economic value for Flotek's customers. Doc. #42, ¶¶40, 52, 64, 71, 80, 94, 118, 124. Based on FracMax's database,[2] Flotek's CEO claimed that Flotek's sales force could demonstrate to potential customers that using Flotek's CnF chemistries added at least an estimated $8 billion in aggregate value to operators who used CnF products when compared to operators that did not. Doc. #42, ¶40. There is little dispute that as advertised, FracMax would have a huge effect on sales of Flotek's key product line, CnF.

In fact, Defendants themselves praised FracMax for being instrumental in accelerating adoption of Flotek's CnF chemistries and significantly increasing CnF sales. Doc. #42, ¶¶42-48. By the third financial quarter of 2015 ("3Q 2015"), CnF sales volumes had increased by 34% compared to 2Q 2015, and 59% compared to year-over-year sales. Doc. #42, ¶48. Defendants

---

[2] FracMax's database reportedly includes production data from over 80,000 wells across key U.S. basins, with over one-third in Texas. Doc. #42, ¶40.

further praised FracMax and its impact on CnF sales as allowing "Flotek [to remain] relatively insulated from energy commodity price volatility." Doc. #42, ¶51. In short, FracMax allegedly allowed Flotek to prove to their customers that its CnF products created value by increasing well profitability by a higher margin than the cost of using CnFs. Accordingly, Flotek's position was—no matter the energy commodity price—if using CnFs increased profits by a higher margin than CnFs cost, customers would continue purchasing its CnF products. FracMax allowed Flotek to visually demonstrate this assertion as fact.

On November 9, 2015, Bronte Capital, a short seller of Flotek stock, published a report identifying errors in production data generated by FracMax for three non-CnF wells. Doc. #42, ¶142. This incorrect data was presented to investors as part of a 183-slide presentation on September 11, 2015. *Id.*; Doc. #47, Ex. 18. This presentation covered numerous aspects of Flotek's business, including the three slides of FracMax generated production data later identified as incorrect. *Id.* Following the publication of the report by Bronte Capital, Flotek immediately denied the allegations that FracMax contained, or that Flotek presented, incorrect data. Doc. #42, ¶147. However, the following morning, November 10, 2015, Flotek issued a press release admitting that the Bronte Capital report was correct. *Id.* The press release also explained the discrepancy; Flotek claimed the incorrect data was caused by analytical processing errors in FracMax's software and/or erroneous data generated by a third-party provider, Drillinginfo. *Id.* Defendants claimed that data provided by Drillinginfo caused FracMax to identify the three non-CnF wells as part of multiple well units (as opposed to single well units), which caused FracMax to incorrectly apply an allocation algorithm to the production of these wells, thereby causing the identified errors. Doc. #42, ¶148. Flotek's CEO also stated that Flotek "should have had . . . quality control in place that could have validated [the Drillinginfo

data], [but] it wasn't, and it is now." Doc. #42, ¶149.

As a result of the foregoing, Plaintiffs allege that the Defendants' assertions about FracMax's usefulness and accuracy were false and misleading, that Defendants knew the assertions were false or misleading when they made them, that Flotek was systematically manipulating the data used by FracMax to make CnF wells look more profitable, and that Flotek lacked any internal controls to verify the accuracy of FracMax's data—even though Defendants were asserting the data used by FracMax was "back-checked" and "validated." *See* Doc. #42.

It is undisputed that the FracMax data presented to investors on September 11, 2015, contained errors showing the production levels of three non-CnF wells 40% to 50% less than actual production. It is also undisputed that during the same presentation, the production data for wells using CnF was not reduced by FracMax. As such, it is undisputed that Flotek either mistakenly, as Defendants claim, or purposefully, as Plaintiffs claim, presented data that showed CnF products enhanced production by 40 to 50 percent more than they actually did (at least as to the six wells presented as part of the September 11, 2015 investor presentation).

In short, Plaintiffs argue that Defendants' proffered explanation for the mistakes in FracMax's data is unreasonable because Defendants' assertion that the self-proclaimed "most compelling sales and value validation tool [Flotek's CEO] had experienced in . . . three decades in this industry," *accidently* contained errors making FracMax's core product appear more beneficial, and therefore more profitable, than it actually was is extremely suspect. *See* Doc. #42. Further, Plaintiffs assert this unreasonableness is highlighted by the fact that only non-CnF wells were adjusted downwardly. *Id.* Plaintiffs maintain that this proves that the inappropriately adjusted data was not simply caused by a mistake in FracMax's algorithm, and Defendants systematically manipulated FracMax's data. *Id.* Plaintiffs also assert that because Flotek's CEO

created FracMax, the Court can assume his knowledge in any systematic rigging of the data. *Id.*

## II. Law

### a. Motion to Dismiss—Rule12(b)(6)

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A motion under Federal Rule of Civil Procedure 12(b)(6) asks a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The plaintiff must plead sufficient facts to state a claim for relief that is facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 566 U.S. at 678. Although a plaintiff's factual allegations need not establish that the defendant is probably liable, they must establish more than a "sheer possibility" that a defendant has acted unlawfully. Id. Determining plausibility is a "context-specific task," and must be performed in light of a court's "judicial experience and common sense." Id. at 679.

In deciding a motion to dismiss under Rule 12(b)(6), a court generally accepts as true all factual allegations contained within the complaint. *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Uni*t, 507 U.S. 163, 164 (1993). However, a court is not bound to accept legal conclusions couched as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Although all reasonable inferences will be resolved in favor of the plaintiff, the plaintiff must plead "specific facts, not mere conclusory allegations." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994). In deciding a motion to dismiss, courts may consider the complaint, as well as other sources such as documents incorporated into the complaint by

reference, and matters of which a court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, at 322 (2007).

**b. Securities Exchange Act § 10(b) Pleading Requirements**

Section 10(b) of the Securities Exchange Act of 1934 empowers the SEC to promulgate rules to prevent manipulative or deceptive practices in the sale or purchase of securities. 15 U.S.C. § 78j(b). Under this grant of authority, the SEC issued Rule 10b–5, which makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

The Fifth Circuit has held the elements of a claim under § 10(b) are: (1) a misrepresentation or omission; (2) of a material fact; (3) in connection with the purchase or sale of a security; (4) scienter by the defendant; (5) justifiable reliance by the plaintiff; (6) damages; and (7) proximate cause. *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 865 (5th Cir. 2003).

Both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA) impose a heightened pleading requirement on § 10(b) claims. FED. R. CIV. P. 9(b); 15 U.S.C. § 78u–4(b). Rule 9(b) requires plaintiffs alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). In order to avoid dismissal under Rule 9(b) for lack of particularity, the Fifth Circuit held a plaintiff must:

> (1) specify each statement alleged to have been misleading, i.e., contended to be

> fraudulent;
>
> (2) identify the speaker;
>
> (3) state where and when the statement was made;
>
> (4) plead with particularity the contents of the false representations;
>
> (5) plead with particularity what the person making the misrepresentation obtained thereby; and
>
> (6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.

*Rosenzweig*, 332 F.3d at 866.

The PSLRA dictates a more rigorous pleading standard for private securities fraud actions in two ways. First, in any such action alleging the defendant made an untrue statement of material fact or a misleading omission:

> [T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b). Second, for claims under which the plaintiff must prove a particular state of mind to recover:

> [T]he complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.

*Id.* (emphasis added). Based on the elements of a § 10(b) claim described above, it is clear that § 10(b) claims are subject to both of these requirements of the PSLRA.

**c. "Strong Inference" of Scienter Requirement**

To establish scienter, a plaintiff must show the defendant intended to deceive, defraud, or manipulate, or that the defendant acted with severe recklessness. *Lormand v. US Unwired, Inc.*,

565 F.3d 228, 251 (5th Cir. 2009). Severe recklessness is defined by an "extreme departure from the standard of ordinary care," and "is limited to highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence." *Local 731 I.B. of Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 957 (5th Cir. 2016) (citing *Owens v. Jastrow*, 789 F.3d 529, 537 (5th Cir. 2015)). Severe recklessness only exists where there was a danger of misleading buyers or sellers which was either known to the defendant or was so obvious the defendant must have been aware of it. *Id.*

The United States Supreme Court has outlined a framework for analyzing motions to dismiss § 10(b) complaints for failing to establish a strong inference of scienter. First, as in any other motion to dismiss, the court accepts all factual allegations in the complaint as true. *Tellabs*, 551 U.S. at 322–23. Second, the court considers the entire complaint, other sources typically examined in a 12(b)(6) motion, sources incorporated by reference into the complaint, and matters of which a court may take judicial notice. *Id.* Third, in determining whether the pleaded facts give rise to a strong inference of scienter, as required by the PSLRA, a court should consider all of the facts alleged, taken collectively, and should also take into account plausible opposing inferences. *Id.* The inference of scienter need not be irrefutable, nor even the most compelling of all competing inferences, but must be strong in light of other inferences. *Id.* at 324. Ultimately, to create an inference of scienter, "the allegations in the complaint must be 'cogent and compelling,' not simply 'reasonable,' or 'permissible.'" *Local 731*, 810 F.3d at 957 (quoting *Tellabs*, 551 U.S. at 323).

Building on this framework, the Fifth Circuit has stated "allegations of motive and opportunity standing alone" are not enough to establish scienter, but such circumstantial evidence may "meaningfully enhance the strength of the inference of scienter." *Ind. Elec.*

*Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 727, 533 (5th Cir. 2008). The Fifth Circuit has also rejected the group pleading approach to scienter, which would allow a plaintiff to prove state of mind through the collective knowledge of all the corporation's officers and employees. *Id.* Instead, a court looks only to the state of mind of the corporate officials who made or issued the alleged misleading statement to determine if a complaint sufficiently pleads scienter. *Id.*

## III. Analysis

Although Defendants arguably assert multiple grounds for dismissal, the cornerstone of their Motion to Dismiss is that Plaintiffs fail to plead facts giving rise to a strong inference of scienter. As the Court agrees, Plaintiffs' complaint must be dismissed.[3] As such, the Court does not reach Defendants' remaining arguments.

Plaintiffs rely—as they are permitted to do—on circumstantial allegations of scienter. *See Ind. Elec.*, 537 F.3d at 533. Although the Court's "job is not to scrutinize each allegation in isolation but to assess all of the allegations holistically," *Tellabs, Inc., 551 U.S.* at 326, the Court has categorized the scienter allegations for convenience. The Court then assesses the allegations holistically.

### A. FracMax's use of an Algorithm, and Flotek's Use of a Third-Party Provider

Plaintiffs rely on Defendants' post-Bronte Capital Report statements to establish that

[3] Though group pleading has been rejected by the Fifth Circuit, Plaintiffs generically refer to "Defendants" throughout much of their complaint. *See* Doc. #42. For convenience, the Court also generically refers to "Defendants" through much of its analysis. As laid out through the Court's analysis section, Plaintiffs fail to prove a strong inference of scienter as to their generic "Defendants," much less as to any one individual Defendant. In fact, the inference of scienter is even lower when considering each Defendant individually. Accordingly, Plaintiffs' claims fail under both the group pleading standard, and under the requirement that Plaintiffs must prove scienter as to each individual Defendant.

"defendants knew Flotek was using allocation algorithms to adjust the data FracMax used in its well comparisons and that data supplied by a third-party source was never verified or back checked due to lack of internal controls." Doc. #48, at 28. However, even assuming this is true, the fact that FracMax used an algorithm to aggregate large amounts of data into statistically significant results, or that Flotek used a third-party to aggregate the publically available data fails to create a danger of misleading buyers or sellers regarding Defendants' assertions to investors that FracMax used "unadjusted" and "back check[ed]" data. Severe recklessness only exists where there is a danger of misleading buyers or sellers which was either known to the defendant or was so obvious the defendant must have been aware of it. *Local 731 I.B.*, 810 F.3d at 957. The Court is unpersuaded that the mere use of algorithms makes the assertion that the data was "unadjusted" misleading. In fact, the common assumption about any data displaying app would be that algorithms were used to generate statistically significant results. The use of an algorithm in and of itself is not materially misleading or fraudulent, nor does it mean the data was adjusted. Algorithms are designed to generate statistics, not to manipulate data. As such, the real issue is whether Flotek deliberately manipulated the algorithms to make CnF wells appear more profitable. As Plaitniffs fail to allege any facts indicating Defendants had reason to believe the data was being manipulated, Flotek's use of algorithms within FracMax is irrelevant to scienter in this case.

Likewise, the fact that Flotek used Drillinginfo, a third-party provider, to obtain data from government sources rather than using its own employees to import the data does not create a strong inference of scienter. Plaintiffs fail to plead any facts showing that Defendants knew the data collected by Drillinginfo contained errors, or that the data didn't represent the publically available data Defendants claimed made up FracMax's database. As such, Plaintiffs fail to plead

any facts suggesting Defendants knew, or should have known, that the information provided by Drillinginfo contained errors, or wasn't an accurate representation of the self-reported E&P company data. Without an allegation indicating that Defendants had some reason to doubt the data supplied by Drillinginfo, the fact that Flotek used a third-party to aggregate the publically available data is irrelevant to whether Defendants knew, or should have known, the data was inaccurate.

Even if Flotek could have provided clearer disclosures regarding the use of algorithms or the reliance on Drillinginfo, Flotek's actual disclosures are not so blatantly misleading as to be severely reckless. *Local 731 I.B.*, 810 F.3d at 957 (stating severe recklessness is defined by an "extreme departure from the standard of ordinary care," and "is limited to highly unreasonable omissions or misrepresentation that involve not merely simple or even inexcusable negligence"). Accordingly, the lack of these disclosures fails to support an inference of scienter in relation to Flotek's alleged manipulation of FracMax's data.

### B. Lack of Internal Controls

Plaintiffs also rely heavily on the fact that Defendants failed to verify the accuracy of the data provided by the third-party, while simultaneously claiming that the data was "back-check[ed]." However, the third-party in this case was simply tasked with collecting and aggregating publically available data, a seemingly simple task. Failure to double check the aggregation of publically available data you paid a third-party to complete cannot equate to recklessness. If so, businesses would legally be forced to double check any work completed by independent contractors. At best, failing to verify data provided by Drillinginfo indicates poor business judgment, but poor business judgment does not support a finding of scienter. *See Owens v. Jastrow*, 789 F.3d 529, 544 (5th Cir. 2015) (finding the combination of poor business

judgment and a financial motive do not support the inference of scienter).

Notably absent from Plaintiffs' Complaint are any allegation or facts suggesting Defendants should have known the data provided by DrillingInfo was inaccurate. Though Defendants maintained the data used in FracMax was "back check[ed] and validate[d]", there are no allegations that Defendants asserted the back checking and/or validation was completed by an employee of Flotek, as opposed to a third-party. Accordingly, Flotek's use of a third-party does not make Defendants assertion that the information was "back check[ed] and validate[d]" misleading. Though Flotek's failure to verify data supplied by DrillingInfo may be relevant to potential negligence, the Court cannot conclude Defendants acted with an intent to deceive or with severe recklessness based on their lack of internal controls. *See Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 431-32 (5th Cir. 2002) (stating internal control deficiencies were insufficient to give rise to inference of fraud or severe recklessness); *Goldstein v. MCI WorldCom*, 340 F. 3d 238, 253-54 (5th Cir. 2003) (characterizing internal control allegations as "allegation of mismanagement" rather than of "severe recklessness by [the individual defendants]" and affirming dismissal); *Oklahoma Firefighters Pension & Riterment Sys. V. IXIA*, _F. Supp. 3d_, 2014 WL 4978568, at *26 (C.D. Cal. Oct. 6, 2014) ([m]ere allegations that Ixia had deficient internal controls are insufficient to give rise to a strong inference of scienter"); *In re BP p.l.c. Secs. Litig.*, 852 F. Supp. 2d 767, 819 (S.D. Tex. 2012) (granting motion to dismiss because "it is more likely that [defendants' misstatements] . . . are evidence of careless mistakes at the management level" and "do not give rise to the required strong inference of corporate scienter"). Without some allegation calling into question the accuracy of the data provided by Drillinginfo, Flotek's use of a third-party is irrelevant. Further, Flotek's lack of internal controls in and of itself is insufficient to give rise to the required strong inference of scienter.

### C. The Fact that the "Errors" in FracMax made CnF Products Appear More Profitable

Plaintiffs next point to the fact that the data presented at the September 11, 2015 presentation was undisputedly adjusted in a way that made Flotek's CnF products look more beneficial than they actually were. Plaintiffs argue this discrepancy gives rise to an inference of scienter because a random mistake occurring in a way that undisputedly benefits the Defendants is improbable. While it is true that of the six wells presented at the September 11, 2015 presentation only the three non-CnF wells were downwardly adjusted, Plaintiffs failed to plead facts establishing this discrepancy is true throughout FracMax's 80,000 well database. Without specific allegations indicating this discrepancy is true throughout the entirety of FracMax's database, a trend as to six wells out of 80,000 is not sufficient on its own to establish a strong inference of scienter.

That being said, this favorable mistake in the data undoubtedly contributes to an inference of scienter. However, this inference is weakened when considering plausible counter inferences, as required. *Tellabs*, 551 U.S. at 322-23. Specifically, the inference of scienter is weakened in light of Flotek's explanation of the discrepancy (that the three non-CnF wells were contained in single well units, but were mistakenly identified as being contained in multiple well units, which caused FracMax to reduce the wells production data accordingly). As there are no allegations indicating that the three CnF wells presented at the September 11, 2015 presentation were also contained in single well units, Defendants' articulated reason for why only the three non-CnF wells were affected by FracMax's alleged problems is particularly compelling. Accordingly, though relevant to whether Plaintiffs have established a strong inference of scienter, the above does not create a strong inference of scienter on its own.

### D. The Importance of FracMax, and CnF Products, to Flotek

Likewise, Plaintiffs urge that because the alleged fraud goes to the very heart of Flotek's business, its CnF product line, the Court can infer scienter. In short, Plaintiffs urge that because Defendants had a motive to make CnF look beneficial, the Court can infer scienter. The Court disagrees. *See Ind. Elec. Workers' Pension*, 537 F.3d at 533 (stating that "allegations of motive and opportunity standing alone" are not enough to establish scienter). Yes, the fact that the alleged fraud made Flotek's key product look more beneficial than it actually was—at least in regards to the six identified wells—is clearly relevant; however, the nature of an error alone cannot support a strong inference of scienter. *See Owens v. Jastrow*, 789 F.3d 529, 541 (5th Cir. 2015) (refusing to infer scienter even though "the magnitude [of the misstatement] was undoubtedly large"); City of Pontiac Gen. Employees' Ret. Sys. V. Hanger, Inc., No. A-14-CA-1026-SS, 2017 WL 384072, *7-8, *11 (W.D. Tex. Jan. 26, 2017) (granting dismissal even though the company overstated its pre-tax income by $95 million over five years because, despite the magnitude and duration of the inaccurate financials, the complaint did not allege particularized facts supporting a "strong inference of scienter").

Defendants do not dispute that FracMax was an important part of their business, but Plaintiffs fail to plead any facts indicating any of the Defendants had an expertise in developing or testing software (much less that they developed the algorithm used in this case), or that they had knowledge of any potential red flags about FracMax's accuracy. Accordingly, the "importance" of FracMax to Flotek's business does little to indicate that Defendants would have, or should have, learned of the mistaken data before the publication of the Bronte Capital report. Additionally, the fact that Flotek immediately denied the truthfulness of this report, before later—after time to investigate—admitting it was true, indicates Defendants were likely not

aware of the identified discrepancies before their identification.

Lastly, Plaintiffs assert the importance of FracMax to CnF sales makes it impossible that Defendants were unaware that FracMax used an algorithm, and/or that Flotek used a third-party to aggregate the data. The Court agrees. However, as indicated above, the fact that FracMax used an algorithm, or that Flotek used a third-party to aggregate the data, does little to create an inference that Defendants knew, or should have known, the data was being inappropriately adjusted, or that the data was untrustworthy. Accordingly, the fact that Defendants knew that FracMax used an algorithm and that a third-party aggregated the data used in FracMax does little to nothing to create an inference of scienter in this case.

**E. Defendant Chisholm's Involvement in the Inventing of FracMax**

Plaintiffs also assert that Defendant Chisholm's status as one of FracMax's inventors, and spokesperson, allows this Court to impute knowledge about FracMax's false data onto him. Like above, Plaintiffs argue that Chisholm's status as inventor and spokesperson makes it illogical to argue Chisholm was unaware that FracMax used an algorithm, and/or that Flotek used a third-party to aggregate the data. Again, the Court agrees. However, as indicated above, the fact that FracMax used an algorithm, or that Flotek used a third-party to aggregate the data, fails to create an inference that Chisholm knew, or should have known, the data was being inappropriately adjusted, or that the data was untrustworthy. Though Chisholm's status as an inventor of FracMax certainly proves knowledge about FracMax as a whole, it provides little to no proof that Chisholm knew about the mistakenly adjusted data. Without particularized allegations that Chisholm, or any of the other Defendants, had reason to doubt the data generated by FracMax, their positions within Flotek does little to establish an inference of scienter.

### F. Holistically

"A plaintiff cannot meet his burden of pleading scienter without stating any facts showing that defendant's alleged statement was belied by his actual knowledge of contradictory facts or by facts so obvious that the defendant had to have been aware of it." *In re Franklin Bank Corp. Secs. Litig.*, 782 F. Supp. 2d 364, 376 (S.D. Tex. 2011). Plaintiffs' Complaint is completely lacking in this regard. Plaintiffs ask this Court to assume scienter based solely on the importance of FracMax to Flotek's business, Defendants' positions within the company, and the fact that the alleged "mistake" happened in a way that made Flotek's core product, CnF, look more profitable.[4] These allegations taken together are not enough to establish a strong inference of scienter. Plaintiffs assert two different theories of the case in an attempt to establish a strong inference of scienter.

First, that Defendants intentionally manipulated FracMax's data to make Flotek's CnF products appear more profitable. However, the only allegations that support such an inference of scienter (knowledge or reckless disregard of intentional manipulation) is the fact that only non-CnF wells were adjusted and that FracMax was an important component of Flotek's business. However, as explained above, this is not enough to establish a strong inference of scienter. In fact, it is much more reasonable to infer that the incorrect data was caused by a mistake in the algorithm, and/or a mistake by Drillinginfo than it is to infer the mistaken data was intentionally manipulated. It is likely that Defendants picked the six wells showing the starkest example of CnFs' production benefit for their September 11, 2015 presentation, and it makes logical sense

---

[4] The Court also considered the SEC's inquiry into FracMax, and Defendants' retention of internal consultants and a special committee to review FracMax and Flotek' CnF efficacy claims. However, as laid out above, all of Plaintiffs' assertions, taken holistically, still fail to establish an inference of scienter.

that the wells showing the starkest example would be the ones mistakenly manipulated by FracMax. FracMax is a customer-facing app, and Flotek only disclosed FracMax data to investors on limited occasions. It is unlikely that Flotek's executives would pick three knowingly manipulated wells to use as their example of FracMax, especially when considering that anyone seeing this data could double check its accuracy via public channels. Accordingly, Plaintiffs fail to plead facts establishing a strong inference of scienter in regards to the theory that Defendants intentionally manipulated the data.

The second theory asserted by Plaintiffs is that Defendants recklessly disregarded signs that FracMax data should not be trusted, while simultaneously presenting FracMax data as proof that Flotek's CnF products worked. However, Plaintiffs fail to plead any facts showing that Defendants had a reason to doubt the data produced by FracMax. Instead, Plaintiffs rely solely on the fact that FracMax used an algorithm to generate its data, and that Flotek used a third-party to aggregate the raw data from publically available sources. As explained above, these facts are not enough to create a strong inference of scienter. At worst, Flotek's failure to double-check FracMax's data indicates mismanagement. Accordingly, Plaintiffs also fail to establish a strong inference of scienter in regards to their theory that Defendants recklessly trusted FracMax data.

The above is true even when you view all the allegations as a whole. To survive dismissal under the PSLRA, the scienter inference "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling." *Tellabs I*, 551 U.S. at 325. Though Plaintiffs have pleaded facts establishing a permissible inference of scienter, they have failed to establish a compelling inference, as required by the PSLRA. As laid out above, there is a strong, plausible, nonculpable inference that Defendants mistakenly relied on the data produced by FracMax—which Defendants later learned was inappropriately adjusted via unknown mistakes in

FracMax's algorithm, and/or unknown mistakes in the data aggregated by a third-party. Thus, at most, Plaintiffs pled facts supporting an inference that Defendants were negligent in their failure to double-check the accuracy of FracMax data presented to investors; however, negligence, even negligence equating to gross mismanagement, fails to demonstrate a strong inference of scienter. *See Goldstein v. MCI World Com*, 340 F.3d 238, 253-54 (5th Cir. 2003).

## IV. Conclusion

As explained above, Plaintiffs fail to satisfy their burden under the PSLRA. While Plaintiffs' allegations do establish a slight inference of scienter, the allegations are not enough to meet the strong inference standard. As pled, only the nature of the errors, the importance of FracMax to Flotek, and that Flotek lacked internal controls to catch the mistake contribute to an inference of scienter. Plaintiffs' allegations, therefore, do not present a strong inference of scienter against any Defendant "at least as compelling as any opposing inference of non-fraudulent intent." *See Tellabs*, 551 U.S. at 3143. Accordingly, for the foregoing reasons, the Defendants' Motion to Dismiss is GRANTED, and all claims brought by Plaintiff in this case are DISMISSED.

It is so ORDERED.

Date MAR 2 9 2017

The Honorable Alfred H. Bennett
United States District Judge